**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 45 MAP 2012 |
| | : |
| Appellant | : Appeal from the Order of Superior Court at |
| | : No. 1669 MDA 2010, Dated September 16, |
| | : 2011, Reversing the Judgment of Sentence |
| v. | : of the Cumberland County Court of |
| | : Common Pleas, Criminal Division, at No. |
| | : CP-21-CR-2876-2009, Dated July 20, |
| AMY N. KOCH, | : 2010, and Remanding |
| | : |
| Appellee | : 39 A.3d 996 (Pa. Super. 2011) |
| | : |
| | : ARGUED:   October 16, 2012 |
| | : RESUBMITTED:   February 19, 2014 |


**OPINION IN SUPPORT OF AFFIRMANCE**


**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED:   December 30, 2014**

This discretionary appeal concerns the proper manner in which cell phone text messages can be authenticated and whether and when such messages are inadmissible hearsay.  The trial court admitted the messages as sufficiently authenticated and not hearsay; the Superior Court reversed on both grounds in a unanimous published opinion that ordered a new trial.  This Court accepted the Commonwealth's appeal, but has evenly divided.   For the reasons set forth below, we would affirm.

On March 14 and 24, 2009, North Middleton Township Police Officer Richard Grove and another officer, acting on suspicion that unlawful controlled substances were present and that drug sales activity was being transacted, conducted "trash pulls" of discarded garbage at a residence lived in by Amy Koch (appellee), her boyfriend, Dallas Conrad, and her brother, Norman Koch, also known as "Matt."   Appellee's brother was

the original target of the officers' suspicions after a confidential informant indicated that he was living at the residence and selling cocaine from his car. Based upon evidence recovered from the trash pulls, including plastic "baggies" containing residue of both cocaine and marijuana, the police obtained a search warrant, which was served and executed at appellee's residence on March 25, 2009, by Officer Grove and North Middleton Township Police Detective Timothy Lively. During the search, the officers found two baggies, each containing roughly ten grams of marijuana, and $700 cash in the drawer of a dresser in the master bedroom; in a shoebox on top of the same dresser, the officers found a used "bong," two marijuana pipes, a grinder (commonly used to separate marijuana seeds and stems from the leaves that are smoked), an open package of "Philly Blunts," empty baggies of various sizes, and the "end portion of a joint." Searching the basement of the residence, the officers found a small bag of marijuana inside a freezer and a "bud" of marijuana in a small woven basket.

During the search, the officers also found a used marijuana pipe and an electronic scale covered with marijuana residue on top of the refrigerator in the kitchen. Detective Lively looked for cell phones in the residence because drug dealers and users commonly use cell phones to communicate and arrange transactions. He seized two cell phones, one of which he found on the kitchen table near where appellee was during the search; appellee asked him several times "why her cell phone was being taken." Appellee was arrested, along with Dallas Conrad and Norman Koch.

After obtaining a warrant, Detective Lively searched for drug-related communications and information on appellee's cell phone. He read text messages stored on the phone, both sent and received, and transcribed the messages that he considered to be indicative of drug sales activity. These included the following outgoing messages, which were sent between March 15 and 21, 2009:

To "Pam": "I got a nice gram of that gd Julie to get rid of dude didn't have enuff cash so I had 2 throw in but I can't keep it 8og."

To "Matt": "Can I get that other o from u"

To "Tiff": "Sorry I didn't wait I wanted 2 smoke but call me then if u r cuming out."

To "Pam": "Not lookn good on my end can u get a g 4 me"

To "Pam": "no go 2 nite he only could split a ball w me but I got a new hook up and its cheap"

To "Brian": "Call me I nd trees"

To "Pam": "If do happen to cum across any 2 nite let me know this is not that gr8"

Detective Lively subsequently testified at trial that he believed these messages reflected drug sales activity due to references he understood from his training and experience: "Julie" refers to cocaine, an "O" is an ounce of drugs, "G" is a gram of drugs, "trees" refers to marijuana, and a "ball" is about 3.33 grams of cocaine, a common quantity about the size of a pool ball, which is also referred to as an "eight ball."

Along similar lines, Detective Lively transcribed the following incoming messages that were received on appellee's phone between March 18 and 21, 2009:

From "Tam": "was wondering if u could hook me up then after work"

From "Tam": cool I neED a half r u gonna text me then"

From "Tam": cool when did u want me to come out"

From "Pam": "let me know asap"

From "Pam": [17 minutes later] "sweet how much?"

From "Pam": [3 minutes later] "K"

From "Pam": [45 minutes later] "well?"

From "Pam": [1 minute later] "k"

From "Pam": [33 minutes later] "hey u"

From "Pam": [6 minutes later] "can u part with any?"

From "Pam": [2 minutes later] "tks tree looks good"

Detective Lively interpreted the messages from "Tam" as drug-related, understanding "a half" to mean some manner in which drugs are measured, such as a half an ounce of marijuana, and the terms "hook me up" and "come out" to be arrangements for a sale. Likewise, Detective Lively concluded that the messages from "Pam" reflected a request for a price and, ultimately, a successful deal made for marijuana ("tree") nearly two hours later the same night.

In light of the foregoing, along with the physical evidence recovered from the search, appellee was charged with felony possession with intent to deliver (PWID) marijuana, both as a principal and an accomplice; criminal conspiracy with regard to the PWID charge; and unlawful possession (of marijuana), a misdemeanor.[1] Dallas Conrad's case was severed from appellee's prior to trial, and Norman Koch's case concluded after a preliminary hearing during which he pled guilty to possession of drug paraphernalia, leaving appellee the only defendant to stand trial.

At appellee's jury trial in May 2010, the Commonwealth called Officer Grove, who testified to the physical evidence of drug activity -- marijuana, cash, baggies, and scales -- that was found during the search; a forensic chemistry expert who confirmed that the confiscated substances were marijuana; and Detective Lively. When the prosecutor began to question Detective Lively about his interpretation of the text messages on appellee's cell phone, defense counsel, at sidebar, objected to the messages as hearsay, describing them as "unreliable because the phone was shared between two people" and

---

[1] Respectively, 35 P.S. § 780-113(a)(30), 18 Pa.C.S. § 306, id. § 903(a)(1), and 35 P.S. § 780-113(a)(16).

protesting against the detective "read[ing] a conversation between two people that have not been called as a witness [sic]. . . . He cannot testify to the contents of . . . a text message if he wasn't a party to it." The prosecutor responded that the messages were not hearsay because their import was only "that these things were said on this phone . . . and that these [statements] would constitute drug receipts, drug statements, and orders." N.T., Trial, 5/26/10, at 10-75.

The court ruled that Detective Lively could testify about his impression of the messages on appellee's phone to show that, in the prosecutor's words, "[appellee's] phone was used in drug transactions, and, therefore, it makes it more probable than not when [appellee] possessed this marijuana that she did so with the intent to deliver as opposed to personal use." Defense counsel reiterated his objection, arguing that admission of the contents of the messages invited speculation by the jury as to "who is making those calls," and was prejudicial to appellee in regards to both the PWID and conspiracy charges. The court overruled appellee's objection but agreed to provide a cautionary instruction based on the outcome of Detective Lively's testimony regarding the text messages. Id. at 76-79.

Thereafter, Detective Lively read aloud and discussed the text messages and his understanding that they were related to drug sales activity; the messages were referred to neutrally as appearing on "this phone" as opposed to "appellee's phone" or to or from appellee herself. The detective's substantive testimony during direct examination focused on terms used in the text messages and his opinion of their drug-related meanings, such as "g's" and o's" for grams and ounces, "Julie" for cocaine, "ball" for an "8-ball" of cocaine. Id. at 80-89.

During cross-examination, appellee elicited the detective's admission that he had not followed up by attempting to contact the purported recipients and authors of the text

messages, whose numbers were in the phone, in order to ascertain whether appellee or someone else was the correspondent. Id. at 105-06. During both direct and cross-examination, Detective Lively testified that although the messages were in a phone that appellee had asserted she owned, he could not determine whether appellee had been the correspondent in the purported drug sales messages. At least one outgoing message, although non-incriminating in its content, suggested that appellee was not the author of certain messages, since appellee was referred to in the third person in an exchange concerning a baked goods fundraiser: "Let me know total, and I'll give [appellee] money 4 u." Id. at 82-84, 92, 103-06, 128-29. Appellee did not take the stand in her own defense.

The jury convicted appellee of felony PWID (as an accomplice) and the misdemeanor possession charge (also as an accomplice), but found her not guilty of the conspiracy charge. Appellee filed a post-verdict motion challenging admission of the content of the text messages as inadmissible hearsay. The motion also reiterated appellee's objection regarding authorship of the messages, arguing that the messages were "inherently unreliable as there is no competent way for a jury to decide which messages came from which sender [*i.e.,* appellee or Dallas [Conrad]]." Post-Verdict Motion, 6/4/10, at 2. The trial court denied appellee's post-verdict motion and sentenced her to 23 months of supervised probation. Appellee appealed to the Superior Court and filed a statement pursuant to Pa.R.A.P. 1925(b), again challenging admission at trial of the text messages as unauthenticated and hearsay, and also challenging the sufficiency and weight of the evidence supporting her convictions.

In its Pa.R.A.P. 1925(a) opinion, the trial court noted the dearth of contemporary Pennsylvania case law on the authentication of electronic and wireless communications, but then opined that the Commonwealth had presented sufficient circumstantial evidence

to establish the authenticity of the messages, as required by Rule of Evidence 901 ("Authenticating or Identifying Evidence).[2]  According to the court, the possibility that someone other than appellee was the author of all, some, or any of the outgoing drug-sales-related text messages went to the weight of the evidence.  Trial Ct. Op., 11/30/10, at 12-13.

Turning to appellee's claim that the text messages were inadmissible hearsay, the trial court stated that the messages were not admitted to prove the truth of the matter asserted, but to demonstrate an operative fact of the crime of PWID -- that appellee was sending and receiving communications intended to facilitate drug sales activity.   The trial court finally addressed appellee's sufficiency and weight claims, stating that while the evidence was largely circumstantial, it was sufficient to support appellee's convictions and that the convictions were not against the weight of the evidence.   Id. at 13-17.

In her brief to the Superior Court, appellee pursued both her sufficiency claim, arguing that the uncertain authorship of the text messages rendered the evidence insufficient to prove PWID, and her challenge to the admissibility of the text messages. Appellee also claimed that the text messages were improperly admitted because: "Although the District Attorney was clear that the text messages were not being offered for the truth of the matter asserted, once admitted into evidence, the jury was then left to guess at which if any text messages were sent and received by [appellee] and then speculate on whether or not [appellee] was involved with delivering narcotics.   In addition, certain text messages were clearly evidencing drug transactions; it was not a coincidence that [appellee] was then convicted of [PWID]."   Appellee's Brief to Superior Court, at 16-20.   In response, the Commonwealth posited, as the trial court had, that

---

[2] The Rule states: "(a) **In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   Pa.R.E. 901(a).

questions of authorship of the text messages went to the weight of the evidence. Regarding appellee's hearsay claim, the Commonwealth hewed to its position that the messages were not admitted to prove the truth of the matter asserted, but rather to show appellee's intentional involvement in selling drugs, not through the messages' content, but by the fact that she was actively engaged in making arrangements using her cell phone. Commonwealth's Brief to Superior Court, 5/23/11, at 6-9.

In a unanimous published opinion authored by the Honorable Mary Jane Bowes, Commonwealth v. Koch, 39 A.3d 996 (Pa. Super. 2011), the Superior Court reversed and remanded for a new trial. The panel agreed with the trial court that the Commonwealth's evidence, considered collectively, was sufficient to support the PWID conviction. Nevertheless, the panel agreed with appellee that the text messages should not have been admitted at trial, and the error was not harmless; thus, a new trial was warranted. Id. at 1001-07.

The panel believed that the question of what proof is necessary to authenticate a text message raised an issue of first impression in Pennsylvania and began its inquiry by looking to cases involving other forms of electronic communication, such as instant messages, which were at issue in In re F.P., 878 A.2d 91 (Pa. Super. 2005). Briefly, in F.P., the Superior Court concluded that sufficient evidence existed to authenticate and admit transcripts of instant message exchanges between F.P. and his assault victim. F.P. referred to himself by his first name in the exchanges and did not deny sending them during a school mediation; in addition, details in the transcripts foretold specifics about the dispute and the assault on the victim. Id. at 93-95. Notably, the F.P. panel recognized the difficulty in authenticating electronic communications and the dearth of applicable precedent, but declined to "create a whole new body of law just to deal with e-mails or instant messages." Rather, the court opined: "We believe that e-mail

messages and similar forms of electronic communication can be properly authenticated within the existing framework of Pa.R.E. 901 and Pennsylvania case law." Id. at 95-96.

In this case, the panel recognized that establishing authorship of a text message can be difficult without direct evidence or an admission by a correspondent, but that circumstantial evidence, if sufficient, is also acceptable, as a number of other states have held, including cases the panel cited from North Dakota, Maryland, Illinois, and North Carolina. Although text messages are particular to the cell phone on which they are received or from which they are sent, the panel concluded that this fact alone is not sufficient, since it is simple enough for another person to use one's phone. And in this case, the Commonwealth's own witness, Detective Lively, agreed that authorship was unknown. The messages themselves did not contain any "contextual clues" like those in F.P., and the mere fact that appellee admitted the phone itself was hers did not establish that she had been an active correspondent in these particular drug sales text messages. Thus, the panel concluded that authentication -- the Commonwealth's assertion that these messages were sent by appellee to arrange and plan drug sales -- had not been established. Koch, 39 A.3d at 1003-05.

The panel decided that the text messages were also inadmissible as hearsay that was not offered for any reason other than to show the truth of the matter asserted by the Commonwealth as to the content of the messages -- that appellee used her phone to conduct drug sales and therefore possessed marijuana with the intent to deliver it and not merely for personal use. The panel added that the improper admission of the messages was compounded by their being used as the basis for an expert opinion by Detective Lively that appellee was using her cell phone to arrange drug sales via text messaging. And, according to the panel, the messages could not be admitted under any recognized exception to the hearsay rule. The panel again concluded that admission of the

unauthenticated hearsay messages was not harmless error: "The prejudicial effect of the improperly admitted text message evidence was so pervasive in tending to show that [appellee] took an active role in an illicit enterprise that it cannot be deemed harmless. Even with the improperly admitted evidence, the jury only found [appellee] liable as an accomplice." For this independent reason, the panel held that a new trial was required. Id. at 1005-07.

This Court granted the Commonwealth's petition for allowance of appeal, which challenged both of the evidence-related grounds for the Superior Court's grant of a new trial. Commonwealth v. Koch, 44 A.3d 1147 (Pa. 2012).

The standard of review governing evidentiary issues is settled. The decision to admit or exclude evidence is committed to the trial court's sound discretion, and evidentiary rulings will only be reversed upon a showing that a court abused that discretion. A finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." Commonwealth v. Laird, 988 A.2d 618, 636 (Pa. 2010) (citation and quotation marks omitted); see also Commonwealth v. Sanchez, 36 A.3d 24, 48 (Pa. 2011). Matters within the trial court's discretion are reviewed on appeal under a deferential standard, and any such rulings or determinations will not be disturbed short of a finding that the trial court "committed a clear abuse of discretion or an error of law controlling the outcome of the case." Commonwealth v. Chambers, 980 A.2d 35, 50 (Pa. 2009) (jury instructions); see also Commonwealth v. Karenbauer, 715 A.2d 1086, 1095 (Pa. 1998) (scope of cross-examination).

## I. **Authentication**

We address authentication first because, logically, it is the question precedent: if proffered evidence fails an authentication challenge, meaning that its proponent cannot prove that the evidence is what the proponent claims it to be, the evidence cannot be admitted, regardless of its potential relevance, and the hearsay query is not reached.

The Commonwealth argues that the Superior Court decision conflicts with Superior Court precedent, specifically the statement in In re F.P., 878 A.2d at 96, that: "[w]e see no justification for constructing unique rules for admissibility of electronic communications such as instant messages; they are to be evaluated on a case-by-case basis as any other document to determine whether or not there has been an adequate foundational showing of their relevance and authenticity." To the Commonwealth, the panel decision here improperly elevates the standard for authentication of electronic communications, which often can only be established by recourse to circumstantial evidence, to "*prima facie* plus." The Commonwealth also believes the panel misread Rule of Evidence 901 and "infused" authentication with relevancy in a manner likely to have a far-ranging negative impact on prosecution of drug (and other) offenses where electronic communications are at issue. The Commonwealth asserts that while a communication from a physically nebulous source, such as an e-mail address or a phone number, may need additional circumstantial evidence to establish authenticity, this case involves a communication (text message) from an actual physical source (cell phone) that can be physically and directly attributed to the defendant (appellee). According to the Commonwealth, text messages require less support to be authenticated when the phone itself is available and part of the evidence. Here, the Commonwealth argues, there is no dispute that appellee claimed the actual phone was hers during the search, and when the messages were recovered from the phone, there was sufficient evidence of authorship by appellee to prove authentication. Commonwealth's Brief at 26-33.

Moreover, the Commonwealth avers, proof of authorship of the messages here is not required because appellee was charged as both a principal and an accomplice; thus, the Commonwealth asserts, the crucial fact is not that appellee did or did not write, send, and receive the drug sales text messages, but that the actual physical phone she acknowledged to be hers was used in drug transactions. According to the Commonwealth, "[t]he texts were not authenticated as . . . authored by [appellee], but rather, as the prosecutor stated at trial: . . . to show that [appellee's] phone was used in drug transactions," making it more probable than not that appellee was consciously involved in the subject drug sales. Id. at 33-38.

Appellee disputes the claim that the panel's decision created an improperly heightened burden of proof. Appellee asserts that, pursuant to Rule 901, all parties must show that proposed evidence can be identified as genuinely what the proponent claims it to be, here, drug sales text messages sent and received by appellee on her personal cell phone. Appellee adds that, the Commonwealth's case for authentication of the text messages at trial revealed its own weakness when Detective Lively conceded that someone other than appellee likely authored at least some of the text messages. Appellee avers that the Commonwealth was not held to a higher or "*prima facie* plus" standard, but that it simply could not make a sufficient case to satisfy Rule 901 that appellee herself was the author of the incriminating text messages. Id. at 10-13.

Appellee further asserts that mere possession of a cell phone does not prove authorship of text messages sent from that phone, and additional evidence to corroborate the identity of the sender, such as the context or content of the messages themselves, if unique to the parties involved, is needed for authentication. Appellee concludes by stating that the drug sales text messages in this case were never authenticated as having been written by her, even though they were "in" her phone, and the Superior Court

properly found that their admission against her as proof of intent to deliver was reversible error by the trial court, warranting a new trial. Id. at 13-15.

As both lower courts recognized, communications technology presents arguably novel questions with regard to evidentiary issues like authenticity and hearsay. It appears that there have been no further intermediate court developments in this specific area since the Superior Court's opinion in this case was published.

Pennsylvania Rule of Evidence 901, adopted as part of the Evidence Code promulgated in 1998, is titled "Authenticating or Identifying Evidence," and provides in relevant part:

> **(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> **(b) Examples.** The following are examples only--not a complete list--of evidence that satisfies the requirement:
>
> (1) *Testimony of a Witness with Knowledge.* Testimony that an item is what it is claimed to be.
>
> *     *     *     *
>
> (4) *Distinctive Characteristics and the Like.* The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

Pa.R.E. 901(a) & (b).[3]   Thus, evidence that cannot be authenticated directly pursuant to subsection (1) may be authenticated by other parts of section (b) of the Rule, including circumstantial evidence pursuant to subsection (4).   In the context of a communication,

---

[3] Subsection (b) provides ten ways that evidence can be authenticated and states clearly that these are simply examples, not a complete list.

subsection (4)'s "distinctive characteristics" may include information tending to specify an author-sender,[4] reference to or correspondence with relevant events that precede or follow the communication in question, or any other facts or aspects of the communication that signify it to be what its proponent claims. Commonwealth v. Collins, 957 A.2d 237, 265-66 (Pa. 2008). Authentication generally entails a relatively low burden of proof; in the words of Rule 901 itself, simply "evidence sufficient to support a finding that the item is what the proponent claims." Pa.R.E. 901(a).

This Court has not yet spoken on the manner in which text messages may be authenticated where, as here, there is no first-hand corroborating testimony from either author or recipient. We are mindful, however, that the burden for authentication is low, and we agree with the Justices writing in support of reversal that the trial court did not abuse its discretion in finding that the Commonwealth met the burden here, albeit we see the question as close, and we view authorship as a potentially relevant part of authentication analysis.

As a predicate matter, we also agree with the panel below that modern communications technology can present arguably novel questions with regard to evidentiary issues like authenticity and hearsay. A handful of states' high courts have spoken on this issue since 2007, when the Supreme Court of Rhode Island decided State v. McLaughlin, 935 A.2d 938 (R.I. 2007). In that case, threatening text messages sent by the defendant to his girlfriend were admitted at his probation violation hearing, albeit with the *caveat* that "[s]trict application of the rules of evidence is not required at a probation violation hearing." Id. at 942. The messages were authenticated by direct testimony from the recipient herself. Rodriguez v. State, 273 P.3d 845 (Nev. 2012),

---

[4] Or, as the case may be, the recipient, although in practice, the question almost invariably concerns authorship.

involved incriminating text messages sent from the assault victim's cell phone, which had been stolen from her during the attack, to her boyfriend, who showed them to police detectives. After considering a number of cases from other states' courts, including the Superior Court's opinion in this case, Nevada's high court concluded:

> [E]stablishing the identity of the author of a text message through the use of corroborating evidence is critical to satisfying the authentication requirement for admissibility. We thus conclude that, when there has been an objection to admissibility of a text message, the proponent of the evidence must explain the purpose for which the text message is being offered and provide sufficient direct or circumstantial corroborating evidence of authorship in order to authenticate the text message as a condition precedent to its admission.

Id. at 849 (citations & footnote omitted). Other states' high courts also call for direct or circumstantial "corroborating evidence of authorship" to authenticate text messages.[5]

---

[5] Gulley v. State, 423 S.W.3d 569, 578-79 (Ark. 2012) (recipient testimony and corresponding specific facts in message contents sufficient to authenticate text messages as written by defendant); Holloman v. State, 744 S.E.2d 59, 61-62 (Ga. 2013) (recipient, the infant murder victim's mother, authenticated messages through testimony that she knew defendant and recognized text messages she received on her phone as from him); State v. Koch, 334 P.3d 280, 288 (Idaho 2014) ("[E]stablishing the identity of the author of a text message or e-mail through the use of corroborating evidence is critical to satisfying the authentication requirement for admissibility."); State v. Elseman, 841 N.W.2d 225, 233 (Neb. 2014) (text messages sufficiently authenticated by testimony of defendant's girlfriend that she and defendant exchanged the messages); State v. Thompson, 777 N.W.2d 617, 625-26 (N.D. 2010) (testimony of husband sufficient to authenticate threatening text messages written and sent to him by wife); Tienda v. State, 358 S.W.3d 633, 642 (Tex. Crim. App. 2012); ("[T]hat a text message emanates from a cell phone number assigned to the purported author -- none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity"); see also Smith v. State, 136 So.3d 424, 433 (Miss. 2014) (citing with approval Texas case of Tienda v. State for principle that "something more" is needed when authentication of electronic communication is at issue); State v. Lampman, 22 A.3d 506, 516 (Vt. 2011) (origin of allegedly threatening text messages from victim to defendant would need to be shown to lay foundation for question involving contents of messages).

On the other hand, one state's highest court has taken a position more aligned with that of the trial court, which is that a text message may be authenticated with only the cell phone number and possession of the phone on which the message appears. See State v. Forde, 315 P.3d 1200, 1220 (Ariz. 2014) (because both sender and recipient were registered subscribers of phone numbers and both possessed phones used to send and receive, prosecution met its authentication burden).

In this case, the trial court shared Arizona's simple and permissive approach, while the Superior Court panel below aligned itself with the growing number of jurisdictions that require at least some corroboration of authorship, whether direct or circumstantial. The authentication inquiry will, by necessity, be fact-bound and case-by-case, but, like courts in many other states, we believe that authorship is relevant to authentication, particularly in the context of text messages proffered by the government as proof of guilt in a criminal prosecution. This is not an elevated "*prima facie* plus" standard or imposition of an additional requirement. Rather, it is a reasonable contemporary means of satisfying the core requirement of Rule 901 when a text message is the evidence the Commonwealth seeks to admit against a defendant; the Commonwealth must still show that the message is what the Commonwealth claims it to be, and authorship can be a valid (and even crucial) aspect of the determination.

Here, appellee admitted ownership of the cell phone, and other evidence from the Commonwealth showed that the content of the messages indicated drug sales activity. However, whether appellee was the author of the messages was not established by any evidence, either direct or circumstantial. Nevertheless, the burden for authentication is not high, and appellee was charged as both an accomplice and a conspirator in a drug trafficking enterprise. As such, authorship was not as crucial to authentication as it might be under different facts. For these reasons, we are satisfied that the trial court did not

abuse its discretion in determining that the Commonwealth met its authentication burden as to the text messages.

## II. Hearsay

In our view, however, the Commonwealth cannot have it both ways when it comes to appellee's separate and related challenge that the substance of the text messages was inadmissible hearsay. Of course, the concepts of inadmissible hearsay and non-hearsay, which can be admissible, are well-known evidentiary principles:

> Hearsay, which is a statement made by someone other than the declarant while testifying at trial and is offered into evidence to prove the truth of the matter asserted, is normally inadmissible at trial. . . . In the alternative, out-of-court statements may be admissible because they are non-hearsay, in which case they are admissible for some relevant purpose other than to prove the truth of the matter asserted. See Commonwealth v. [Raymond] Johnson, 576 Pa. 23, 838 A.2d 663, 680 (2003) (defendant's statements threatening witness's family admissible as verbal acts, a form of non-hearsay, because evidence not offered to establish truth of matter asserted, but rather, to demonstrate fact of attempted influencing of witness); Commonwealth v. Puksar, 559 Pa. 358, 740 A.2d 219, 225 (1999) (statements by witness who overheard defendant and his brother (the victim) arguing were admissible as non-hearsay because not offered to prove truth of matter asserted, but rather to establish motive for killings).

Commonwealth v. Ali, 10 A.3d 282, 315-16 (Pa. 2010) (quotation marks & some citations omitted). When this type of evidence is in question, the distinction can be subtle between a statement that, if admitted, would serve as affirmative and substantive evidence of the accused's guilt, and non-hearsay that may be admitted to establish some other aspect of a case, such as motive or a witness's relevant course of conduct. Commonwealth v. Busanet, 54 A.3d 35, 68-69 (Pa. 2012); Commonwealth v. Johnson,

42 A.3d 1017, 1035 (Pa. 2012).   On appeal, reviewing courts should be wary of proffered bases for admission that may be pretexts for getting fact-bound evidence admitted for a substantive purpose.   See Commonwealth v. Moore, 937 A.2d 1062, 1071-73 (Pa. 2007) (victim's statements to father, sister, and friend concerning bullying by defendant were not admissible under state of mind hearsay exception: "Commonwealth's allusions to the victim's state of mind in this passage and otherwise are tangential, and it is readily apparent that the state of mind hearsay exception was used as a conduit to support the admission of fact-bound evidence to be used for a substantive purpose.").

The Commonwealth argues here, as it did below, that the message contents were not offered for the truth of the matter asserted, but as "drug-related records" of the sort found admissible in Commonwealth v. Glover, 582 A.2d 1111, 1113 (Pa. Super. 1990) (book recording dates and sums of money "was not offered to prove the truth of the sums and dates it contained, only that these types of records were kept and were in the possession of Glover.   A written statement is not hearsay if offered to prove that it was made rather than its truth. This book was offered to show that it existed and was found in Glover's room; as offered, it is not hearsay.") (citation omitted).   The Commonwealth also relies upon Commonwealth v. Murphy, 613 A.2d 1215, 1225 n.11 (Pa. Super. 1992), a case involving charges of, *inter alia*, murder, criminal conspiracy, and corrupt organizations, which held that the challenged documents "were not 'business records' in the ordinary sense, offered to establish the actual workings of a business or to prove the truth of the dealings contained in them.   Instead, the evidence was offered and received to show that the parties mentioned therein were associated with one another.   See Commonwealth v. Glover . . . ."

The Commonwealth also cites federal cases where "records" allegedly like those represented here in the text messages on appellee's phone, were found to be admissible

non-hearsay because the evidence simply established the accused's relationship with other individuals in an illegal conspiracy or operation. In the alternative, the Commonwealth argues, the messages here were not hearsay because they were admissible as the statements of co-conspirators or co-participants in a crime, pursuant to Rule of Evidence 803(25)(E). Commonwealth's Brief at 22-26.

In response, appellee argues that, "in reality at trial," the messages here were obviously hearsay proffered (and wrongly admitted) solely for their content and truth. Appellee adds that the impropriety was compounded by the messages' use as a basis for the testimony by Detective Lively, the Commonwealth's expert. The purpose of the detective's testimony was to deconstruct and interpret the slang that was used in the messages – *i.e.*, their very text – to explain to the jury what was said out of court in the messages. And, of course, it just so happened that what the detective discerned in the messages was evidence of the very crimes with which appellee was charged. Thus, the detective opined that the text messages evidenced drug sales in a manner that implicated appellee, even though the detective admitted he could not prove she had been a correspondent. Appellee distinguishes Glover because, in that case, the notebook containing dates and sums was described as only possibly (not surely) indicating drug sales activity and was proffered not to prove the truth of its contents, but to show only "that these types of records were kept and were in [Glover's] possession." 582 A.2d at 1113.

Appellee further argues that the content of the text messages was offered and used by the Commonwealth at her trial purely to impress upon the jury that her possession of marijuana was with the intent to deliver; she asserts that without the "truth" revealed in the messages, her conviction on the PWID charge, even as an accomplice, would have been unlikely. Appellee avers that the Commonwealth's expressed reason for seeking to submit the message contents (which clearly imply drug sales) to the jury,

"under the guise" that they were not being admitted for the truth of the matter asserted, was to prove her intent to deliver, and not merely to show the otherwise irrelevant fact that she just happened to own a phone that had messages on it referring to what a police expert thought were drug sales. Appellee's Brief at 5-9.

Taking into account the foregoing arguments, we note the following. Lawyers with trial experience know that when a party has classic hearsay evidence that it knows is harmful to the opposing party, but cannot actually identify a theory to overcome exclusion on hearsay grounds, a common fallback position is to declare that the out-of-court statements are not being offered for their truth. Counsel in such circumstances recognize that if they can manage to get the evidence admitted this way, the party's cause will be advanced, irrespective of reliability or relevancy. But, the required analytical response to this facile fallback position is: if the hearsay is not being offered for its truth, then what exactly is its relevance? And, assuming some such tangential relevance, does the probative value of the evidence outweigh the potential for prejudice? In this case, the inquiry is not difficult because the only relevance of this evidence -- drug sales text messages on appellee's cell phone -- is precisely for the truth of the matter asserted, and we have little doubt that that is precisely how the lay jury construed it.

At trial, after appellee lodged her hearsay objection while Detective Lively was on the stand, the prosecutor responded that he was not trying to prove the truth of the matter asserted in the messages, but wanted the detective to testify that he understood the messages to be similar to "buy sheets" recording and arranging drug sales and to show that "these statements were on the phone that belonged to her and that -- that these other types of statements then would constitute drug receipts, drug statements, and orders." The prosecutor later added: "[T]he purpose of this evidence is to show that [appellee's] phone was used in drug transactions, **and, therefore, it makes it more probable than**

**not when the Defendant possessed this marijuana that she did so with the intent to deliver as opposed to personal use**." N.T., Trial, 5/26/10, at 73-79 (emphasis supplied).

The trial prosecutor's candor should be determinative here. The prosecutor conceded that he sought to admit the message contents as substantive evidence probative of appellee's alleged intent to engage in drug sales activity. And that is certainly how the jury would construe the messages. It requires a suspension of disbelief to conclude that the messages had any relevance beyond their substantive and incriminating import, especially because they served as a platform for the crucial expert testimony of Detective Lively. Furthermore, as the panel below recognized, the Commonwealth's evidence of appellee's intent to deliver, without the truth revealed in the messages (via the expert testimony of the detective), was negligible. Simply put, the messages were out-of-court statements that were relevant, and indeed proffered, for a purpose that depended upon the truth of their contents, as probative of appellee's alleged intent to deliver. Accordingly, appellee's hearsay objection had merit and, in light of the paucity of other evidence that she possessed illegal drugs with the intent to deliver, the trial court's abuse of discretion in admitting the message contents was not harmless error.

In closing, we note that all sorts of inadmissible evidence may exist that might be helpful to a party's cause, and we understand the special incentive for the Commonwealth, in criminal cases, in perfect good faith, to attempt to make use of all the helpful "evidence" it may have. This is so because, unlike the defendant, the Commonwealth generally only gets one opportunity in a case; there is a very limited prospect of appeal. But, courts must remain mindful of those legal precepts that regulate unreliable evidence, in service of higher principles, such as the right to a fair trial.

We would affirm.

Mr. Justice Baer and Madame Justice Todd join this opinion.