J. S42032/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES GREGORY, | : | |
| | : | |
| Appellant | : | No. 3098 EDA 2013 |

Appeal from the Judgment of Sentence September 6, 2013
In the Court of Common Pleas of Northampton County
Criminal Division No(s).: CP-48-MD-0001261-2013

BEFORE: SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED AUGUST 31, 2015**

Appellant, James Gregory, appeals from the judgment of sentence entered in the Northampton County Court of Common Pleas following his convictions on five counts of indirect criminal contempt[1] for violating a Protection from Abuse ("PFA") order.[2] His attorney, James F. Brose, Esq. ("Counsel"), has filed an **_Anders_**[3] petition for leave to withdraw. Counsel's

---

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S. § 6114(a).

[2] The Commonwealth filed a letter with this Court, stating it does not prosecute contempt charges arising from PFA orders and thus will not file a brief.

[3] **_See Anders v. California_**, 386 U.S. 738 (1967); **_Commonwealth v. McClendon_**, 434 A.2d 1185 (Pa. 1981).

*Anders* brief presents three issues: the authentication of a radio show transcript admitted into evidence, the court's imposition of separate sentences for five PFA violations, and the denial of Appellant's request to continue the contempt hearing. We grant Counsel's petition to withdraw, deny Appellant's *pro se* motion for extension of time to file a *pro se* brief, and affirm the judgment of sentence.

On May 20, 2013, the trial court granted Angelina Ingrassia's petition for a temporary PFA order against Appellant, her then-boyfriend with whom she lived. This temporary order arose from Ingrassia's allegation that on May 15th, Appellant kicked, strangled, and choked her, bit her wrist, pushed "really hard" on her eye sockets, and prevented her from leaving their residence. Trial Ct. Op., 8/7/14, 1-2. Ingrassia also averred that on the following day, she and Appellant attended a political event, and that evening Appellant sent her "multiple threatening text messages."[4] *Id.* at 3.

On July 3, 2013, the trial court conducted a hearing on three indirect criminal contempt complaints, finding Appellant guilty at one and imposing six months' supervised probation. The court also entered a final PFA order.

On July 12, 2013, the court found Appellant in indirect criminal contempt on another complaint and imposed a sentence of six months' incarceration. On August 2nd, the court granted immediate parole.

---

[4] Appellant was "a write-in candidate" for mayor of the City of Bethlehem. N.T. PFA H'rg, 9/6/13, at 9, 47.

On September 6, 2013, the court held a hearing on five additional complaints of indirect criminal contempt, which are the bases of the instant five PFA violations. Appellant was represented by Michael Corcoran, Esq. ("Trial Counsel,") who informed the court he was "formally retained" at 10:30 p.m. the prior night. N.T. at 2. Trial Counsel requested a continuance, but the court denied it, stating it had granted Appellant a continuance one week earlier for the specific purpose of retaining counsel.

The court then heard the allegations of the five complaints, which we summarize as follows. First, at the July 12, 2013 PFA hearing, Appellant gave a hand-written letter to Ingrassia's attorney to give to Ingrassia. *Id.* at 34. The letter "included the phrase, 'I loved you at hello.'" Trial Ct. Op. at 7.

Second, on July 22, 2013, Ingrassia received a handwritten letter from inmate Will Filer, whom she did not know. The letter, which was "torn-up" when Ingrassia received it, stated, "[Appellant] cannot write to you directly because of the PFA. He said to tell your mom not to worry about the thousand [sic]. His attorneys will cost much more." N.T. at 21, 22. A second note in the envelope stated, "I loved you at hello. I'm so, so sorry I rarely told you so." *Id.* at 22.

Next, on August 2, 2013, Ingrassia received a letter from inmate Raymond Davenport, whom she did not know. *Id.* at 20-21. Included was a note, in Appellant's handwriting, which stated, "I loved you at hello. I'm

so, so sorry I rarely told you so." *Id.* at 19, 20.

Fourth, Ingrassia reported that beginning on "the day after he was released from prison," Appellant called her more than twenty times. *Id.* at 41. Most of the calls came from a phone number she did not recognize. *Id.* at 42. Ingrassia answered one call but did not speak, "just to see if [the other person] would speak, and they hung up." *Id.* at 38, 43. At Ingrassia's request, her friend "called the number, and a gentleman answered." *Id.* at 38. The friend asked who he was, and he replied he was Appellant; the friend recognized Appellant's voice. *Id.*

Finally, on August 26, 2013, Appellant spoke on his morning radio program about "expos[ing] Northampton County corruption."[5] *Id.* at 5, 11. At the conclusion of the program, Appellant said before playing a song:

> [T]he name of the song for Lina, Angelina, which [sic] . . .
> Honey, I totally understand if you listen to it, you're right.
> I gave you everything you wanted except my heart. I
> didn't do that, I apologize. You deserve that. If you come
> back, you'll get it.

*Id.* at 14, 51. At the contempt hearing, Ingrassia presented[6] a partial transcript of the broadcast made by Bernie O'Hare, a blogger, which included

---

[5] Appellant testified he started a radio show on "WPGA" to address local and national political issues. N.T. at 48.

[6] An attorney for the Commonwealth was present at the hearing, but the sole statement she made was "Yes," in response to the trial court's asking her, after it found Appellant guilty of indirect criminal contempt, if she agreed with the probation officer's sentencing recommendation. *See id.* at 80.

the above statement.[7] O'Hare listened to and recorded the entire hour-long broadcast, and "transcribed the portion of the radio program that [he] felt was a direct violation of the PFA." *Id.* at 10-11.

The trial court found Appellant guilty on all five counts of indirect criminal contempt and imposed five consecutive terms of three to six months' incarceration, for an aggregate sentence of fifteen to thirty months. The court also found Appellant violated his parole and probation and re-sentenced him to six months, to run concurrently with the contempt sentences. Trial Ct. Op. at 8.

Appellant filed a timely motion for reconsideration of sentence, which the court denied.[8] Appellant filed a timely notice of appeal on November 7, 2013, and complied with the court's order to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal. The trial court issued an opinion on August 7, 2014.

Before appellate briefs were filed, this Court received notice that Appellant's counsel passed away.[9] Current counsel, Attorney Brose, entered

---

[7] "A recording of the broadcast was not submitted as evidence." *Anders* Brief at 4.

[8] The trial court's opinion stated Appellant filed a second post-sentence motion on October 7, 2013, and that it denied it on October 22nd. Trial Ct. Op. at 9. However, neither the motion or order denying it appears in the certified record, and there are likewise no docket entries for these filings.

[9] This was not Attorney Corcoran, Appellant's counsel at the contempt hearing.

his appearance on February 20, 2015, and on May 1st filed the instant *Anders* petition and brief for our review. Appellant then filed a *pro se* "Motion to Grant Petition of Appellant's Counsel to Withdraw and Request for a 60 Day Extension to File a *Pro Se* Brief."[10]

We examine whether Counsel complied with the requirements of *Anders* and *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009).

> This Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant].
>
> Prior to withdrawing as counsel on a direct appeal under *Anders*, counsel must file a brief that meets the requirements established by our Supreme Court in *Santiago*. The brief must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> *Santiago*, 978 A.2d at 361. Counsel also must provide a copy of the *Anders* brief to his client. Attending the brief

---

[10] Appellant also filed a *pro se* letter with this Court, attaching a copy of two pages of his Rule 1925(b) statement that were not included in Counsel's *Anders* brief.

must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worth of the court[']s attention in addition to the points raised by counsel in the ***Anders*** brief."

***Commonwealth v. Orellana***, 86 A.3d 877, 879-80 (Pa. Super. 2014) (some citations omitted). If counsel complies with these requirements, "we will make a full examination of the proceedings in the lower court and render an independent judgment [as to] whether the appeal is in fact 'frivolous.'" ***Id.*** at 882 n.7 (citation omitted).

In the instant appeal, Counsel's ***Anders*** petition avers he conducted a conscientious review of the record and believes there are no non-frivolous bases for appeal. Counsel attached a letter he sent to Appellant, in which he stated he could not find any valid bases for appealing, and advised Appellant he has the right to file an appellate brief *pro se* or with private counsel. In his ***Anders*** brief, Counsel summarizes the underlying facts of this case, presents the claims Appellant wishes to pursue, cites relevant law, and discusses why he believes the claim is frivolous. We find Counsel has complied with the requirements of ***Anders*** and ***Santiago***. ***See Orellana***, 86 A.3d at 880. We thus examine the record to determine whether the issues on appeal are wholly frivolous. ***See id.*** at 882 n.7.

As stated above, Counsel raises three issues for our review: the authentication of the transcript of Appellant's radio show broadcast, the court's imposition of separate sentences on each violation of the PFA, and

the court's denial of a continuance at the indirect criminal contempt hearing.

With respect to the court's admission of the transcript of the radio broadcast, we summarize the following. Appellant objected to the admission of the partial transcript of the show, arguing "[t]he identity of the person who gave it to [Ingrassia] has not been identified" and there was no one "to authenticate the context of this document." *Id.* at 6-7. The court allowed the evidence.

We note the relevant standard of review:

> The decision to admit or exclude evidence is committed to the trial court's sound discretion, and evidentiary rulings will only be reversed upon a showing that a court abused that discretion. A finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." . . .

*Commonwealth v. Koch*, 106 A.3d 705, 710-11 (Pa. 2014) (plurality).[11]

Pennsylvania Rule of Evidence 901(a) states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "Testimony that an

---

[11] In *Koch*, an evenly divided Pennsylvania Supreme Court panel affirmed the decision of the Superior Court. *Koch*, 106 A.3d at 705. The question before the Supreme Court was "the proper manner in which cell phone text messages can be authenticated and whether and when such messages are inadmissible hearsay," and the standard of review and law concerning authentication cited above was not at issue. *See id.* at 706.

item is what it is claimed to be," by "a [w]itness with [k]nowledge," satisfies this authentication requirement. Pa.R.E. 901(b)(1). "Authentication generally entails a relatively low burden of proof; in the words of Rule 901 itself, simply 'evidence sufficient to support a finding that the item is what the proponent claims.'" *Koch*, 106 A.3d at 713 (quoting Pa.R.E. 901(a)).

In the case *sub judice*, Ingrassia called Bernie O'Hare to authenticate the transcript. N.T. at 7. O'Hare testified as follows. He was a blogger and "was listening to the radio show for the entire week because [Appellant] stated he was going to expose Northampton County corruption [and because Appellant] is a candidate for mayor in the City of Bethlehem." *Id.* at 9-10. O'Hare agreed with the court's statement that he had a "business interest," "[r]elated to media," in taping the program. *Id.* at 11-12. O'Hare was also aware Appellant had a PFA order and "was concerned [Appellant] might violate the PFA." *Id.* at 10. He recorded the one-hour radio program in its entirety, but only "transcribed the portion of the radio program [he] felt was a direct violation of the PFA." *Id.* at 10-11. "Right at the conclusion of the show," O'Hare made "a verbatim transcript of exactly what [Appellant] stated on the air," "typ[ing] it out word for word, exactly what he said." *Id.* at 9, 12. O'Hare then forwarded the transcript "to an attorney who [he] believe[d] was meeting with" Ingrassia. *Id.* at 11.

In its opinion, the trial court responded to Appellant's claim as follows:

> When . . . Appellant challenged the accuracy of the transcript, [Ingrassia] called its author as a witness. . . .

> Mr. O'Hare testified that he had transcribed the recording at issue verbatim.
>
> . . . Appellant cross-examined Mr. O'Hare on this subject but was unable to elicit a material retraction. He then challenged Mr. O'Hare's motives in recording the broadcast and providing it to [Ingrassia]. This line of questioning has no bearing on whether the document is what its proponent claimed it to be: an accurate transcript of . . . Appellant's August 26, 2013 broadcast. Accordingly, we submit that the Court did not err in concluding that the transcript was properly authenticated and therefore admissible into evidence.[ ]

Trial Ct. Op. at 14-15.

We find no abuse of discretion in the trial court's reasoning. **See** **Koch**, 106 A.3d at 710. O'Hare's testimony—that he transcribed verbatim Appellant's statements—was sufficient for authentication. **See** Pa.R.E. 901(b)(1); **Koch**, 106 A.3d at 713. Accordingly, we agree with Counsel that this issue is frivolous.

The second claim in the **Anders** brief is that the "multiple incidents" underlying the instant five contempt findings "should have been grouped for sentencing." **Anders** Brief at 5 (capitalization removed).

We note:

> To prove indirect criminal contempt, evidence must be sufficient to establish: the court's order was definite, clear, specific leaving no doubt in the person to whom it was addressed of the conduct prohibited; the contemnor had notice of the order; the act constituting the violation was volitional; and the contemnor acted with wrongful intent.

**Commonwealth v. McMullen**, 961 A.2d 842, 849 (Pa. 2008) (citation omitted).

"[N]othing in Section 6114 [of the Protection from Abuse Act, "Contempt for violation of order or agreement,"[12]] either explicitly or implicitly forecloses prosecuting a defendant on multiple [indirect criminal contempt] counts for multiple violations of a single PFA order." ***Hill v. Randolph***, 24 A.3d 866, 870-71 (Pa. Super 2011).

> Giving both discretion on how best to charge the contemnor/criminal and power to impose consecutive maximum contempt sentences equips the criminal justice system to address most effectively the peculiar needs of victims of domestic abuse. Achieving this end is clearly the goal of the PFA Act.

***Id.*** at 871.

Appellant testified to the following at the contempt hearing. With respect to the statements in his radio broadcast, he conceded those "references were pretty much made," but explained they were made by "[m]y person on the show, myself or my character, if you will." N.T. at 49. He stated he "was reading in [sic] the Facebook post," and, "What I am saying is the character is hard to describe unless you—there's two

---

[12] Section 6114 provides:

> Where the police, sheriff or the plaintiff have filed charges of indirect criminal contempt against a defendant for violation of a protection order issued under this chapter, a foreign protection order or a court-approved consent agreement, the court may hold the defendant in indirect criminal contempt and punish the defendant in accordance with law.

23 Pa.C.S. § 6114(a).

characters, myself and the character that is portrayed as the writing on Facebook page [sic]." *Id.* at 46-50.

Appellant denied writing the letters sent to Ingrassia by his prison mates. *Id.* at 53, 54. He testified Filer was his roommate, and Filer "had broken up with his girlfriend, who is young, and he was asking if he can write to [Appellant's] girlfriend." *Id.* Appellant replied to him, "[T]hat's entirely up to you." *Id.* Appellant conceded he wrote one of the notes, but stated he wrote it before the contempt hearing and Filer inserted it with his letter because he "was aware that [Appellant] was in love with Ms. Ingrassia." *Id.* at 54, 56. Appellant further testified the other inmate, Davenport, "was aware of [Appellant's] feelings to Miss Ingrassia" and "of the fact that [Appellant] was not able to make any contact with her." *Id.* at 59-60. Appellant then testified:

> So, you know, through me, because that is why it's written in my handwriting, [Davenport] didn't feel comfortable with his handwriting, so he kind of wrote it through me and signed it and sealed it and delivered it. And I certainly can't.

*Id.*

With respect to the phone calls, Appellant testified Ingrassia's phone number and his wife's[13] phone number both began with "241." *Id.* at 57.

---

[13] Aside from Appellant's testimony that his wife's name is Elaine Gregory and he went to her house "to pick up the dog," there is no further information about Appellant's wife in the contempt hearing transcript. *See* N.T. at 57.

On two occasions, he intended to call his wife but accidentally called Ingrassia. He denied placing another eighteen calls to Ingrassia. *Id.* at 58, 62.

In addressing Appellant's claim that the evidence was insufficient to convict him of five counts of indirect criminal contempt, the court opined:

> [In issuing the temporary PFA order, the court[14]] could not have made the prohibition against any communication with [Ingrassia] more explicit. In addition . . . Appellant did not contest his receipt of the PFA. Thus, the first two elements are established.
>
> With respect to the volitional nature of the violations, the Court found that . . . Appellant had used his considerable intelligence and charm in a manipulative and arrogant manner. The Court rejected his attempt to deflect the blame for his comments during the radio show onto his alter ego. The Court also took a dim view of . . . Appellant's attempt to circumvent the PFA through his fellow inmates.
>
> At his sentencing, . . . Appellant handed the letter to [Ingrassia's attorney] in person. The volitional nature of this act is not subject to question. With respect to the phone calls, the Court was entitled to reject . . . Appellant's dubious claim that he had mistakenly dialed [Ingrassia's] number.
>
> In addition, [Ingrassia] testified that she had received at least twenty calls from the unidentified number later determined to belong to . . . Appellant. This volume of calls cannot be attributed to mistaken dialing. With respect to wrongful intent, we observe that . . . Appellant has attempted to trivialize his contemptuous conduct. The

---

[14] The Hon. Lawrence Brenner issued the temporary PFA order, and the Hon. Leonard N. Zito conducted the final PFA hearing and instant indirect criminal contempt hearing.

> Court views his repeated transgressions with significantly less levity.
>
> The precipitating event for the PFA was . . . Appellant's unprovoked assault on [Ingrassia]. . . .
>
> Thereafter, he continued to violate the letter and the spirit of the PFA. He used his radio show to entreat her to return to him. He enlisted his fellow inmates to write love letters to her. He telephoned her repeatedly from an unidentified number. He even handed her . . . attorney a letter during his sentencing for a prior contempt.

Trial Ct. Op. at 16-17.

Again, we find no error in the court's decision. The court's conclusions as to Appellant's deflection of blame are supported by Appellant's own testimony at the hearing. We find no abuse of discretion in the court's finding five separate instances of contempt and imposing five separate sentences. **See Hill**, 24 A.3d at 870-71.

Finally, we consider whether the court violated Appellant's due process rights in denying his request for a continuance at the September 6, 2013 contempt hearing. This Court has stated:

> [T]he grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. . . . A bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion. Instead,
>
> > [a]n appellant must be able to show specifically in what manner he was unable to prepare his defense or how he would have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice.

- 14 -

*Commonwealth v. Ross*, 57 A.3d 85, 91 (Pa. Super. 2012) (citations omitted), *appeal denied*, 72 A.3d 603 (Pa. 2013).

As stated above, at the beginning of the September 6, 2013 contempt hearing, Trial Counsel stated Appellant formally retained him at 10:30 the night before and informed him "there might be some phone records critical to his defense, as well as his phone records." N.T. at 2. Trial Counsel requested for more time to prepare. The court responded that on the prior Friday, it had granted Appellant's request for a continuance

> for the specific purpose of either retaining Mr. Burke[15]or [Trial Counsel].
>
> He has had adequate notice. [Ingrassia] did appear last week and she is here today. The Court is not going to grant further continuances because of the untimely fashion in which you were retained.

*Id.* at 3.

In its opinion, the trial court further reasoned that despite receiving a continuance of one week to retain counsel, Appellant "waited for six days to contact his attorney" and "provided no explanation for this delay." Trial Ct. Op. at 13. It opined that "whatever detriment . . . Appellant may have experienced due to his attorney's lack of notice is attributable to his own inaction." *Id.* The court further noted, nevertheless, that Trial Counsel "still provided a spirited defense." *Id.*

---

[15] The record does not provide more information on Mr. Burke.

- 15 -

We find no abuse of discretion in the trial court's denial of a continuance. *See Ross*, 57 A.3d at 91. Appellant failed to "show specifically . . . how he would have prepared differently had he been given more time." *See id.*

Finally, we consider Appellant's *pro se* "Motion to Grant Petition of Appellant's Counsel to Withdraw and Request for a 60 Day Extension to File a *Pro Se* Brief." The eight-page motion, as well as the eight-page hand-written "supplemental brief," contains a litany of allegations of trial court error, each cursory and lacking meaningful discussion. *See, eg.*, Appellant's Mot. to Grant Pet. of Appellant's Counsel to Withdraw, 5/26/15, at 4 ("PFA means Protection from 'abuse.' None of the alleged violations constituted 'abuse.' Ordering contempt and jail in these instances violated [Appellant's] right to free Speech and Freedom of the Press."), 6 ("Could the Judge, other th[a]n by conjecture, extrapolate, from receipt of [the letters from Appellant's prison mates,] intent on the part of Appellant."). Finding no non-frivolous claim articulated in the motion, we deny it.

We grant Counsel's petition to withdraw and affirm Appellant's judgment of sentence.

Counsel's petition to withdraw granted. Appellant's motion for extension of time to file a *pro se* brief denied. Judgment of sentence affirmed.

J. S42032/15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2015