2021 PA Super 136

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KAMERON EDWARD ORR | |
| Appellant | No. 1195 MDA 2020 |

Appeal from the Judgment of Sentence Entered August 24, 2017
In the Court of Common Pleas of York County
Criminal Division at No: CP-67-CR-0007140-2015

BEFORE:  LAZARUS, J., STABILE, J., AND MUSMANNO, J.

OPINION BY STABILE, J.:                    **FILED JULY 01, 2021**

Appellant, Kameron Edward Orr, appeals from his sentence of life imprisonment following his conviction for first-degree murder.  Appellant contends that the trial court erred by admitting four text messages into evidence that were sent from Appellant's cell phone to the victim several nights before her murder.  Appellant argues that the Commonwealth failed to authenticate these text messages because it failed to demonstrate that Appellant authored the messages.  We hold that the Commonwealth properly authenticated the text messages, and we affirm.

The trial court accurately summarized the evidence adduced during trial as follows:

> From July 17, 2017 to July 21, 2017, [Appellant] had a jury trial in this matter.  The Commonwealth first presented Brent Reinhart to testify.  Reinhart testified that on August 28, 2015, between 12:00 a.m. and 1:00 a.m., while he was getting ready for work at his home on Hartley Street in York, [he] heard more than four gunshots.  [A]fter he heard the shots, he looked out the window

and saw a male with dark skin wearing a hooded sweatshirt walking away briskly.  [Appellant is African-American].

The Commonwealth next called Officer Christopher Husted to testify.  Officer Husted was on duty when he responded to a suspicious vehicle call on North Hartley Street at 3:00 a.m.  The officer observed an immobile, yet running grey Honda Odyssey minivan, and in the driver['s] seat was an unresponsive female who had sustained multiple gunshot wounds.  The body had no pulse, and was cooler than a regular body, leading the officer to conclude that the female was deceased.  The [o]fficer took photos of the van at the crime scene, then turned the investigation over to detectives.

The next witness was Tina Sparks, the mother of the victim, Ruby Mercado.   Sparks testified that on the morning of August 28, 2015, she was informed by the police that her daughter had been shot on Hartley Street and was deceased.  She then testified that her daughter, the victim, shared a child with [Appellant].  She also testified as to receiving a letter from [Appellant] after the victim's death in which he wrote that the victim "didn't die from jealousy, anger, or aggression, and she didn't suffer."  Upon cross-examination, she also testified that at the beginning of that same letter he wrote that he was not guilty of her death.

The Commonwealth next called Dr. Barbara Bollinger, the forensic pathologist who conducted the autopsy on the victim.   Dr. Bollinger testified that the victim had two gunshot wounds to the head, four gunshot wounds to the torso, two gunshot wounds to the right arm, and two gunshot wounds on her left arm.  The two gunshot wounds to the victim's head entered the right side of her head and exited on the left side, and both would have been fatal on their own.  The gunshot wounds to the head also had powder residue and stippling around them, indicating that the barrel of the gun was held about an inch or two from the victim's skin.  The two gunshots to the outside of her right arm were consistent with entry wounds, with power residue and stippling.  The projectiles fractured her humerus bone, then exited the inside of her right arm.  The two wounds on the right arm lined up with two of the wounds to the victim's torso, which would be consistent with the projectiles passing through the arm and into the torso.  There were two other entrance wounds to the torso, and then two exit wounds which lined up with the two wounds to the inside of her left arm.  The wounds to the torso would also have been fatal.

- 2 -

Two projectiles were located in her left arm. The doctor testified that in her opinion, after lining up the wounds on the arms and torso, there were six total gun shots suffered by the victim, coming from a shooter to her right.

Following Dr. Bollinger, the Commonwealth called Detective Christopher Perry. Detective Perry testified that he attended the autopsy of the victim, and collected evidence from it, including the victims clothing, hair, nail clippings, and the projectiles found in the victim's body. Detective Perry testified to his processing of the Honda Odyssey in the York City Police vehicle bay on September 1, 2015. Detective Perry found blood and body tissue on the front driver and passenger seats of the van and detected a large amount of suspected gunshot residue over the front dashboard of the car. Detective Perry also testified to taking swabs for DNA from a gun that was found later in the investigation.

The Commonwealth then called Darren Stephens, who knew both the victim and [Appellant]. Stephens testified that on the night of the incident, he saw the victim driving her van with [Appellant] in the passenger seat twice. The first observation was at about 10:30 p.m., and the second at about 12:00 a.m. The second time he saw them, the van turned on to Hartley Street, before he lost sight of the van. Hartley Street is where Mercado was murdered.

The Commonwealth's next witness was Michael Gorski, a forensic scientist and expert in gunshot residue. Gorski testified that he analyzed the samples taken from the Honda by Detective Perry for gunshot residue. The results of the analysis were that the sample from the passenger center console recorded the highest concentration of gunshot residue. The samples from the steering wheel and the dashboard also contained gunshot residue, but the sample from outside the front passenger door contained no gunshot residue.

The Commonwealth then called Detective Anthony Fetrow. Detective Fetrow testified that on the morning of August 29, 2015, he was with the officers who went to Tina Sparks' home to inform her that her daughter was deceased, and at that time took into evidence the victim's cell phone from Sparks.

Detective Fetrow then testified as to the search of a house in Harrisburg, Pennsylvania at which [Appellant] was apprehended,

- 3 -

and in which the police found [Appellant]'s clothing and a backpack. Inside the backpack was a ZTE cellphone charger and a .357 Smith and Wesson six shot revolver pistol with 6 loose, live rounds.

The Commonwealth next called Trooper Todd Neumyer, a firearms and tool marks expert, who testified that the firearm recovered from the backpack was functional, and that two of the bullets recovered from the victim's body were discharged by that firearm. A comparison for the other two bullets was unable to be made as they were too mutilated. This placed the murder weapon in the possession of [Appellant].

Next, the Commonwealth elicited testimony from Thomas Walsh, a forensic biologist who performed DNA analysis in this case. Walsh testified that he received two reference samples, one from the victim and one from [Appellant]. Walsh compared these to samples received from various items, including: the grip of the firearm, the trigger and hammer of the firearm, the cylinder of the firearm, a hat left in the victim's vehicle, the victim's fingernail clippings; and a ZTE cell phone left in the Honda. Walsh testified that for all the parts of the gun, DNA from both the victim and [Appellant] was detected. DNA from [Appellant] was found on the hat discovered by the police on the floor of the victim's vehicle. As to the fingernail clippings of the victim, no conclusions could be drawn for whether or not [Appellant]'s DNA was present. Finally, for the ZTE cell phone found in the Honda, the major source contributor of DNA was [Appellant]. This evidence, consistent with Stephens' eyewitness testimony, placed [Appellant] in the victim's vehicle immediately before she was murdered.

The Commonwealth next called Don Rau to testify. Rau was the operations manager at Precision Components the night of the incident, a business which was located on Hartley Street in York, and which was outfitted with security cameras. The cameras picked up a vehicle with its lights on appearing on North Harley Street at around midnight of the night of the incident, which was not present on the security cameras at 11:45 PM.

Following Rau, the Commonwealth called Officer Sean Rosier. Officer Rosier assisted in the processing of the crime scene on the morning of August 29, 2015. Officer Rosier took photos of the scene and vehicle, and noticed a hat and a ZTE cell phone on the

front passenger seat floor, which he left to be collected by the officers who processed the Honda at the secure vehicle garage.

Next, the Commonwealth called Detective Kyle Hower. On August 29, 2015, Detective Hower went to the police substation where the Honda van was towed, retrieved the ZTE cell phone located on the passenger floorboard of the Honda, and swabbed that cell phone for DNA. Detective Hower during the course of the investigation also obtained a DNA sample from [Appellant].

Deputy Marshal Phillip Lewis of the U.S. Marshal Service was called next to testify. Deputy Marshal Lewis testified that his office assisted in the apprehension of [Appellant]. He further testified that he apprehended [Appellant] in a house in Harrisburg, Pennsylvania, where a relative of [Appellant] resided. After entering the house, the police called [Appellant] to come downstairs several times before he finally came downstairs from the second floor. Deputy Marshal Lewis stated that when calling for him to come down, they heard shuffling sounds on the second floor.

The Commonwealth then called the affiant, Detective George Ripley, to testify. Detective Ripley testified that when examining the ZTE cell phone that was located on the front passenger floor of the van, he was unable to access the phone, as it was password protected. However, he was able to dial 911 from the phone to get the phone's number, which was the same number that Sparks provided to the Police for [Appellant], that number being 717-318-6391. Detective Ripley also testified that they attempted to locate [Appellant] at all known addresses, and when he was not found at any of these, the York City Police obtained assistance from the U.S. Marshals to find [Appellant]. Upon cross-examination, the detective testified that the cell phone number in question was registered to a Rayniqua Olds. The Commonwealth then called Olds to testify[.] [S]he stated she was dating [Appellant] at the time, and went to Wal-Mart and signed up for a cell phone with the number in question and gave it to [Appellant] to use.

Next, the Commonwealth called [Appellant]'s sister, Latasha Johnson to the stand. Johnson testified that at that time, she was living at the house in Harrisburg at which [Appellant] was apprehended. Johnson stated that early in the day on September 2, 2015, before police arrived at the house, [Appellant] had shown up at the house in Harrisburg unexpectedly and unannounced.

- 5 -

She then testified that a book bag had been found in her room by the police, the book bag that was not hers, and that she had only seen in possession of [Appellant] previously.

Finally, the Commonwealth called Officer Daniel Lentz, who pulled data from the victim's cell phone. The officer recovered text messages between the victim's phone and the phone number associated with the ZTE cell phone found in the van with [Appellant]'s DNA on it. The officer testified to text messages from the ZTE phone that stated, "I'm coming through your mom's door cops called or not your goal for me to go to jail might happen" and "You our[sic] someone in your family are going to eel[sic] these bullets though and if I was you I'd move your van off of Market Street. IDK what you think you are accomplishing with this dumb shit but you are running out of time." That same ZTE number also sent a message to the victim's phone stating, "I don't give a fuck about no charge. If you don't care about a bullet in y'all asses, so it is what it is. Over my seed, blood will spill." Finally, Officer Lentz testified that he found messages from that same ZTE number [Appellant] was using to the victim's phone from August [28], 2015, the night of the murder, right before 10:30 PM, telling the victim to come out to her van.

Trial Court Opinion, 11/12/20, at 2-8 (citations omitted; minor stylistic revisions).

Appellant was arrested and charged with murder. During trial, when Officer Lentz testified, the Commonwealth introduced a series of text messages sent from Appellant's cell phone. Defense counsel objected to the text messages on several grounds, including lack of authentication, the argument Appellant raises in this appeal. Trial Transcript ("Tr."), 7/21/17, at 655-56. The court overruled counsel's objections and admitted the text messages into evidence. *Id.*

Following trial, the jury found Appellant guilty of first-degree murder. The court imposed a mandatory life sentence, and Appellant filed a timely

notice of appeal. On July 8, 2019, this Court affirmed Appellant's judgment of sentence, holding that Appellant waived the sole claim in his appellate brief, a weight of the evidence challenge, by failing raise this issue in the trial court.

Appellant failed to file a timely petition for allowance of appeal with the Supreme Court. Appellant filed a motion for leave to file a petition for allowance of appeal *nunc pro tunc*. On January 6, 2020, the Supreme Court granted Appellant's motion. Subsequently, however, he again failed to file a petition for allowance of appeal. On July 17, 2020, Appellant filed a PCRA petition in the trial court alleging that direct appeal counsel was ineffective for limiting the appeal to an issue that was waived (the weight of the evidence claim). On August 20, 2020, the trial court granted the petition and reinstated Appellant's direct appeal rights. On September 17, 2020, Appellant filed a timely notice of appeal to this Court. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises a single issue in this direct appeal:

Did the trial court err when it held that the text messages [Appellant] allegedly sent to the victim were authenticated by the Commonwealth, as the circumstantial evidence used by the Commonwealth did not show that [Appellant] was the one who sent the threatening text messages, but merely that he had sent the text messages sent the night in question?

Appellant's Brief at 4.

Appellant argues that the Commonwealth failed to authenticate a series of text messages sent from Appellant's cell phone on July 24, 2015, several days before the shooting, and therefore the trial court erred by admitting

these messages into evidence.  Appellant does not challenge the admission of text messages sent on the evening of the shooting.

Rulings on admissibility are committed to the common pleas court's discretion and will only be reversed on appeal where there is an abuse of discretion.  *Commonwealth v. Rogers*, —A.3d—, 2021 WL 1975272, *4 (Pa., May 18, 2021).  An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was either manifestly unreasonable or the product of partiality, prejudice, bias, or ill will.  *Id.*

The first text message on July 24, 2015, at 8:31 a.m., stated:

> I'm coming through your mom's door, cops called or not.  Your goal for me to go to jail might happen, you our someone in your family are going to eel these bullets,  though, and if I was you, I'd move your van off of Market Street.  IDK what you think you are accomplishing with this dumb shit, but you are running out of time.

Tr., 7/21/17, at 679.  The next text message, at 8:40 a.m., stated:

> Y'all crackers keep playing with a man that ain't got nothing to lose anymore and watch exactly what happens.  I'm not 1n [sic] the wrong. All I wanted to do for a week a plus is talk to your thot ass about my kid and want to play, and you think I'mma just let that rock, nah.  Y'all lost my crib, now y'all want to take -- now -- excuse me, now y'all want to play with my kid?  I don't know who you or your family thinks y'all fucking with.  Tall must not. Tall got the wrong one.  I will never [sic] some irresponsible wanna-be loose, dumb ass bitch run loose with my kid and play games just 'cus she feel like it.

*Id.* at 680.  The third text, a few seconds later at 8:40 a.m., stated, "You got fucked up. I will come clap at your entire family for this shit.  Now keep

playing, ma. Keep it up." *Id.* The fourth and final text, at 9:01-9:06 a.m., stated:

> But you think shit's a game. Look, if I see Jessie walking up west Street, your mom chilling on her chair, you out. You out there or catch CJ riding his fucking bike 1n the parking lot again like it's all good, before you stop doing dumb shit, I'mma clap the bullshit out of whoever till I'm not around. I don't give a fuck about no charge if you don't care about a bullet 1n y'all asses, so it is what it 1s. over my seed, blood will spill.

*Id.* at 681.

According to Appellant, "the context of the text messages even when combined with proof that Appellant owned the phone in question and used it on the night of the slaying does not establish the requisite proof to authenticate the texts in question . . ." Appellant's Brief at 16. We disagree.

Pennsylvania Rule of Evidence 901 requires authentication prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to subsection (b)(1), may be authenticated by other parts of subsection (b), including circumstantial evidence pursuant to subsection (b)(4). Pa.R.E. 901(b)(4) (item's appearance, contents, substance, internal patterns, or other distinctive characteristics, taken together with all the circumstances).

In **Commonwealth v. Koch**, 39 A.3d 996 (Pa. Super. 2011), *affirmed by equally divided court*, 106 A.3d 705 (Pa. 2014), the defendant was charged with possession with intent to deliver ("PWID") marijuana both as a principal and accomplice. A police detective testified that text messages on the defendant's cell phone demonstrated that the phone was used in drug transactions. It was conceded, however, that someone other than the defendant likely authored at least some of the text messages. Defense counsel objected that the text messages were unauthenticated, because the Commonwealth failed to demonstrate that the defendant sent the text messages. The trial court overruled the objection.

This Court emphasized that text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally. **Koch**, 39 A.3d at 1004. We acknowledged the difficulty in certain cases of establishing authorship of text messages, because more than one individual can access an electronic device without permission. Thus, we held that "authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required." **Id.** at 1005. We determined that the Commonwealth failed to authenticate the text messages. While the detective testified that he accurately transcribed the text messages, we found a "glaring" lack of evidence that the defendant wrote the messages:

No testimony was presented from persons who sent or received the text messages. There are no contextual clues in the drug-related text messages themselves tending to reveal the identity of the sender. In addition to evidence that [the defendant] identified the phone as hers, the trial court relied upon the fact that the cellular phone was found on the table in close proximity to [the defendant]. However, we find [her] physical proximity to the telephone to be of no probative value in determining whether she authored text messages days and weeks before.

*Id.* Accordingly, we reversed and remanded for a new trial.

An evenly divided Supreme Court affirmed our decision to remand for a new trial. On the subject of authentication, the justices disagreed as to whether authorship of a text message was relevant to the subject of authentication.[1] Due to the lack of a majority opinion, the Supreme Court's decision in *Koch* is not binding upon us. *Commonwealth v. Bry'Drick Wright*, —A.3d—, 2021 WL 2345903, n.4 (Pa. Super., Jun. 9, 2021)

---

[1] Chief Justice Castille, joined by Justices Baer and Todd, found that "[no] evidence, either direct or circumstantial," established that the defendant authored the text messages. *Id.*, 106 A.3d at 714. Nevertheless, Chief Justice Castille reasoned that they were properly authenticated because "the burden for authentication is not high, and [the defendant] was charged as both an accomplice and a conspirator in a drug trafficking enterprise. As such, authorship was not as crucial to authentication as it might be under different facts." *Id.*, 106 A.3d at 714. Thus, Chief Justice Castille suggested that authorship could become important under different circumstances.

Justice Eakin, joined by Justice Stevens, concluded that the evidence was properly authenticated. He opined that authorship was irrelevant to authentication, because authorship went to the weight of the evidence rather than its admissibility. *Id.* at 721-22.

Then-Justice Saylor wrote that his views were "closer" to Chief Justice Castille's than Justice Eakin's, *id.* at 717, but he did not join Chief Justice Castille's opinion.

- 11 -

("[b]ecause an equally divided Supreme Court affirmed this Court's grant of a new trial in **Koch**, our Supreme Court's decision is not binding in this case").

In five post-**Koch** cases, we have consistently applied our own opinion in **Koch** as binding on the subject of authentication. **See Commonwealth v. Mosley**, 114 A.3d 1072 (Pa. Super. 2015); **Commonwealth v. Murray**, 174 A.3d 1147 (Pa. Super. 2017); **Mangel**, **supra**; **Commonwealth v. Talley**, 236 A.3d 42 (Pa. Super. 2020); **Bry'Drick Wright**, **supra**. We summarize each of these decisions to emphasize that the authentication questions in these cases (and in the present case) requires nuanced analysis of direct and circumstantial evidence.

In **Mosley**, police officers seized two cell phones from the defendant, Donte Mosley, at the time of his arrest for drug-related offenses. The defendant objected to testimony regarding text messages from the two cellphones due to, *inter alia*, lack of authentication. The trial court overruled his objections. This Court held that the trial court erred by overruling the defendant's objections to lack of authentication:

> The trial court found that the Commonwealth authenticated the messages based on the following facts: (1) similar contacts in both phones; (2) Donte Mosley's mother ("Momma Dooks") as a contact on both phones; (3) mother of Mosley's child texting similar messages on both phones; (4) prior incoming texts referencing "Donte" . . . While these facts may support authentication, the court does not take into account the fact that the texts referencing "Donte" occurred more than one week prior to the current incident and that the texts from Momma Dooks were sent in April, June and July of 2012—weeks to months before Mosley's arrest. Finally, and most relevant to the issue of

authorship, the court does not discuss the fact that there is no reference to Donte in any of the drug-related text messages.

[T]here is no evidence, direct or circumstantial, tending to substantiate that Mosley was the author of the drug-related text messages. Moreover, no testimony was presented from persons who sent or received the text messages. While there may be contextual clues with regard to some texts, (*i.e.*, one of the text messages is from Mosley's mother on July 26, 2012, just 18 days before his arrest, wishing Mosley a happy birthday), there are no such clues in the drug-related texts messages themselves tending to reveal the identity of the sender . . . Additionally, the fact that a text message corroborates the "crazy horse" stamp on one of the baggies of drugs discarded by Mosley just prior to his arrest is merely circumstantial evidence of authentication. Nothing in that specific message, however, indicates the identity of the author or recipient of the message.

*Id.* at 1083.[2]

In *Murray*, the defendant, a parolee, was directed to report to his parole officer within the next 45 minutes for a meeting. During the meeting, the defendant told the parole officer that he was in possession of a .357 revolver that he had taken from another housemate who threatened him with the revolver. The parole officer arrested the defendant for possessing a firearm, a violation of his parole conditions. The parole officer searched the text

---

[2] Furthermore, in an apparent attempt to distinguish *Mosley* from Chief Justice Castille's reasoning in *Koch*, *see* n.1, *supra*, we observed, "Unlike the defendant in *Koch*, who had been charged as both an accomplice and a conspirator, here Mosley was charged with purely possessory offenses, including with the intent to deliver. Therefore, the authorship of the texts is more critical to an authentication analysis under the facts of this specific case." *Mosley*, 114 A.3d at 1083.

messages on the defendant's phone and found two text messages sent earlier that day:

> Yo, Kel if you didn't hear from me by tonight I am locked up. So, my stuff is over 1247 West Huntingdon Street.
>
> And the thing I was telling you about that I took from the bully is in the bathroom right under the tub.

*Id.*, 174 A.3d at 1151. The parole officer searched the bathroom in the defendant's residence and found a .357 revolver hidden under the tub. The trial court determined that the text messages were properly authenticated based on contextual clues in the messages and the fact that the parole officer retrieved the phone from the defendant's person:

> Here, in addition to the fact that the phone was in [the defendant's] possession, the content of the message[s], regarding the sender's expectation that he might be getting locked up that day, and alluding ... to an item taken from the bully, is consistent with the events and chronology of [the defendant] being ordered to report to his parole agent's office within 45 minutes, earlier that same day, and [the defendant's] description of the incident in which he acquired the gun.

*Id.* at 1157 (citing trial court opinion at 5-6) (footnote omitted). Citing our own opinion in *Koch* (and Chief Justice Castille's opinion in support of affirmance in *Koch*), we held that the record supported the trial court's reasoning. *Id.* at 1156-57.

In *Mangel*, the defendant and another individual were charged with assaulting the victim at a graduation party. The victim asserted that he did not know either person and was not in contact with them on the night of the assault, but was able to identify them from Facebook pictures shown by his

- 14 -

family. The Commonwealth sought to introduce (1) undated screenshots of undated chat messages from a Facebook account bearing Mangel's name and (2) a Facebook screenshot wherein a photograph of purportedly bloody hands that had been posted by "Justin Jay Sprejum Hunt." Relying on **Koch**, the trial court denied the Commonwealth's motion to introduce this evidence. It explained:

> [The defendant] did not himself state at any time that the Facebook account in question was his own personal Facebook account and/or that he authored the posts and messages on the Facebook account, and the Commonwealth did not introduce subsequent testimony from any other knowledgeable party to substantiate that the Facebook page (and, by association, the posts and messages contained therein) belonged to [the defendant]. Moreover, the Commonwealth did not obtain the username or password for the Facebook account to confirm its authenticity. Although the Commonwealth did produce evidence allegedly linking [the defendant] to the Facebook page in question, including a name, hometown, school district and certain pictures, this information has generally been held to be insufficient to connect a defendant to posts and messages authored on a Facebook page. In fact, following a search on Facebook for the name of "Tyler Mangel" by [defense counsel], five (5) "Tyler Mangel" Facebook accounts appeared in response to the search, one of which has the same hometown of "Meadeville, Pennsylvania," which contradicts Detective Styn's testimony that only one (1) "Tyler Mangel" Facebook account appeared during her search.
>
> A thorough review of the Facebook posts and messages themselves raises specific issues. First, the evidence presented by the Commonwealth does not indicate the exact time the posts and messages were made. The incident which brought about the instant criminal charges occurred allegedly on June 26th, 2016, according to the Criminal Information. The lack of a date and timestamps raises a significant question regarding the connection of the posts and messages to the alleged incident on June 26th, 2016. Furthermore, the "Tyler Mangel" who allegedly authored the Facebook posts and messages does not specifically reference

- 15 -

himself in the incident on June 26th, 2016; rather, other individuals, many of them who are not directly involved in the instant criminal case, reference a "Tyler Mangel" in response to a post made and in subsequent conversations about an alleged assault. Moreover, the Facebook posts and messages are very ambiguous, containing slang and other nonsensical words with "Like" replies, and do not specifically and directly relate to the alleged incident on June 26th, 2016. Finally, the Commonwealth did not produce evidence as to the distinct characteristics of the posts and messages which would indicate [that the defendant] was the author.

Also, as part of the Commonwealth's Exhibit 2, the Commonwealth introduced a black and white copy of a Facebook picture of a hand, which is allegedly bloody and bruised. However, this picture was posted by a Facebook user named "Justin Jay Sprejum Hunt," who makes no reference to [the defendant] or Craft. Therefore, this Facebook exhibit offered by the Commonwealth is not relevant regarding the authentication of the Facebook posts and messages.

*Id.* at 1163-64 (citing trial court opinion, 7/10/17, at 9-10).

The Commonwealth appealed to this Court. In affirming, we reasoned that

the trial court, in recognizing **Koch** as the controlling legal precedent in Pennsylvania for the authentication of electronic communications, applied the proper standard in determining whether the Commonwealth had presented sufficient direct or circumstantial evidence that [the defendant] had authored the Facebook messages in question. Here, the Commonwealth presented no evidence, direct or circumstantial, tending to substantiate that [the defendant] created the Facebook account in question, authored the chat messages, or posted the photograph of bloody hands. The mere fact that the Facebook account in question bore [the defendant]'s name, hometown and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by [the defendant]. Moreover, there were no contextual clues in the chat messages that identified [the defendant] as the sender of the messages.

- 16 -

*Id.* at 1164.

In **Talley**, an appeal from the defendant's convictions for stalking and related offenses, we held that the trial court properly admitted screenshots of text messages depicted on the victim's cell phone. Citing **Koch**, we held that the Commonwealth furnished sufficient direct and circumstantial evidence to authenticate the text messages as coming from the defendant:

> [The victim], as the recipient of the text messages depicted in the screenshots, offered direct authenticating testimony in which she confirmed that the screenshots accurately reflected the messages she received. **See Mangel**, 181 A.3d at 1162 (recognizing recipient or sender testimony as direct evidence of authenticity). In addition, the Commonwealth proffered circumstantial evidence that identified [the defendant] as the sender of the messages. [The victim] testified that she never received harassing test messages before terminating her relationship with [the defendant]. [The victim] also testified that she received a harassing text message stating that the sender was observing her in a restaurant and police officials were later able to determine that an application installed on her cellular telephone was sharing her location with an individual named "Daniel Talley." In addition, the text messages received by [the victim] referred to specific sexual acts that occurred during intimate moments in the relationship between [the defendant] and [the victim]. Apart from [the victim], only [the defendant] possessed knowledge of those acts. The text messages received by [the victim] also included phrases such as "fake love," an idiom commonly used by [the defendant]. Lastly, police officials uncovered software on [the defendant]'s computer that enabled him to send anonymous text messages. In sum, the Commonwealth introduced direct testimony showing that the screenshots accurately reflected the text messages [the victim] received. In addition, the Commonwealth produced circumstantial evidence linking [the defendant] to the messages received by [the victim], including [the defendant]'s access to a device capable of sending anonymous text messages, displays of knowledge known only to [the defendant] and [the victim], and the use of distinct linguistic phrases commonly used by [the defendant]. The Commonwealth therefore met its burden of authenticating the screenshots.

- 17 -

*Id.* at 60.

Finally, in **Bry'Drick Wright**, during an arrest for drug-related offenses, the arresting officer confiscated the defendant's cell phone with his consent, and the defendant was able to supply the complicated password allowing her access to its messages. In addition, a key in the defendant's possession was seized, and the key unlocked a Chevrolet Impala in which the police found drugs. During trial, a police chief read into evidence several text messages from the phone that supplied significant contextual clues revealing the defendant's identity as the cell phone's user engaged in drug distribution-related communications. Outgoing text messages transmitted during the relevant time stated, "You not beating this case I sentence you to life with Bry'Drick Wright." One incoming text under the title "mom" said "you're texting why not take my calls Bry'Drick," and a second that stated, "Too important to take your mother's calls. That is sad, Bry'Drick. I am home hitting the trash because I knew you wouldn't." *Id.*, 2021 WL at 2345903, *6. Other text messages referred to the Impala. One message on September 21, 2018, thirteen days before the defendant's arrest, inquired whether he was driving the Impala that day. On October 4, 2018, the day of the defendant's arrest, an outgoing text message indicated that he was at his father's residence "hanging out" with his brother "out front", and he needed to check inside the Impala for the keys. *Id.* Nowhere among the messages retrieved in the phone drop was there an outgoing message indicating a

person other than Appellant was using the phone. The Commonwealth offered these messages to authenticate numerous texts from the defendant's phone, made during the same time frame, in which drug sales were arranged. Specifically, incoming messages from September 15 through October 2, 2018, seeking to arrange drug purchases of heroin/fentanyl, such as, "I got 40 can you do a bun?", or pure fentanyl, "do you have white bags," were received and answered. *Id.* The outgoing messages all indicated that the transaction could be made, and the incoming replies frequently confirmed, occasionally with complaints about the quality of the previous bundle purchased. In many text conversations, the outgoing message from the defendant's cell phone told the prospective buyer that their meeting place was "North Street," the street where Appellant was arrested on October 4th. *Id.* Citing *Koch*, we held that this evidence "provided more than mere confirmation that the number or address belonged to a particular person . . . This evidence, collectively, provided contextual clues necessary to authenticate that the incriminating text messages taken from the cell phone Appellant handed to authorities were authored by Appellant." *Id.*

This line of cases demonstrates that the authentication of text messages turns upon the depth of direct and circumstantial evidence of authorship marshaled by the proponent of the text messages. *Koch*, *Mosley* and

*Mangel* provide examples of insufficient evidence of authorship; *Murray*, *Talley* and *Bry'Drick Wright* provide examples of sufficient evidence.[3]

In the present case, while there was no direct testimony concerning the text messages, numerous circumstantial clues demonstrate that Appellant sent them. It is clear that Appellant owned the cell phone. Rayniqua Olds testified that she purchased the phone for use by Appellant, thus establishing his ownership during the requisite time period. N.T. Trial at 631. The phone was found with Appellant's other belongings where Appellant was apprehended. Furthermore, as in *Talley* and *Bry'Drick Wright*, the content of the messages indicates that Appellant wrote them. Appellant and the victim were embroiled in an ongoing custody dispute, and multiple texts focused on this subject. One message stated, "All I wanted to do for a week a plus is talk to your thot ass about my kid." N.T. at 680. Another asked, "Y'all lost my crib, now y'all want to play with my kid?" *Id.* Another states, "I will never some irresponsible wanna-be loose, dumb ass bitch run loose with my kid and play games just 'cus she feel like it." *Id.* Another threatens that "over my seed, blood will spill." *Id.* at 681. In this context, the term "seed" appears to refer to Appellant's children.

---

[3] Effective October 1, 2020, a new provision of the Pennsylvania Rules of Evidence, Pa.R.E. 901(b)(11) (governing authentication or identification of digital evidence), took effect, along with an explanatory comment that refers to *Mangel*. Although this new rule appears to be consistent with *Koch* and its progeny, we will refrain from applying it herein, since trial took place in this case several years before the rule's effective date.

Although Appellant does not contest that he sent text messages to the victim on the night of her murder, he argues that there is no evidence that he sent the earlier, threatening messages in late July 2015. Brief for Appellant at 25. This claim hinges on the idea that, first, Appellant might have told someone else about the domestic custody dispute in question; and second, that someone else both had access to Appellant's phone and would have reason to send those specific messages. The record does not support this speculative notion. Nothing suggests that anyone else knew about the custody dispute or was upset at the victim over this dispute. Nor does any evidence suggest an ongoing custody dispute between the victim and another ex-lover who shared children with her. Nor was there any evidence that a third person had regular access to the cell phone or used it to send text messages to the victim. Unlike in **Koch**, there were not multiple parties who regularly used the phone; only Appellant did. The circumstances surrounding these messages point only to Appellant. As the trial court aptly stated:

> The only valid inference a reasonable person could make, based on the content of the messages, is that it was Appellant who sent them. The absurd implication Appellant seeks to put forth is that some other disgruntled lover who shared a daughter with the victim used his phone number to harass her in a very specific fashion over the course of a month and then lure her out to a van he mentioned multiple times before killing her.

Trial Court Opinion, 11/12/20, at 15. Accordingly, we conclude that Appellant's sole issue in this appeal lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/01/2021