J-A06041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SAMSON EZEKIEL WASHINGTON | : | |
| | : | |
| Appellant | : | No. 87 WDA 2023 |

Appeal from the Judgment of Sentence Entered January 18, 2023
In the Court of Common Pleas of Somerset County Criminal Division at
No(s): CP-56-CR-0000141-2019

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: MAY 2, 2024**

Samson Ezekiel Washington ("Washington") appeals from the judgment of sentence entered by Somerset County Court of Common Pleas ("trial court") following his convictions of two counts each of first-degree murder, aggravated assault, kidnapping, unlawful restraint; eight counts of conspiracy; and one count of possession of a firearm by a prohibited person.[1] Washington raises ten claims of error. After review, we affirm.

Washington, Marekus Benson ("Benson"), and Devon Wyrick ("Wyrick")[2] were members of the East Main Money Gang from Columbus, Ohio, who came

---

[1] 18 Pa.C.S. §§ 2502(a); 2702(a)(1); 2901(a)(3); 2902(a)(1); 903(a); 6105(a).

[2] Washington and Wyrick are half-brothers.

to Johnstown, to sell drugs. In March 2017, a stash house in Johnstown used by the East Main Money Gang was burglarized and the burglars stole drugs, money, and a firearm. Washington, Benson, Wyrick, Jasmine Browning ("Browning"),[3] and Jasmine Hinton ("Hinton")[4] proceeded to Washington's home to discuss the burglary. Gang members contacted several drug users to identify the burglars. On March 26, 2017, Washington and Benson went to a well-known drug house, where they asked Amanda Ehrhart and Tracey Kralik about the missing drugs. While at the house, Benson flashed his gun. Washington and Benson, however, did not learn any information about the missing drugs.

The following day, Joshua Bergmann ("Bergmann") informed Washington that James Smith ("Smith") and Damian Staniszewski ("Staniszewski") were suddenly in possession of a large quantity of drugs. At Washington's request, Bergmann led Washington, Benson, Wyrick, and Deandre Callender ("Callender") to Staniszewski's residence in Portage, Pennsylvania but no one was home. Later that day, however, Smith and Staniszewski contacted Hinton to purchase drugs from Washington and Benson. The parties agreed to meet at the Galleria Mall.

---

[3] Browning and Washington have a child together.

[4] Hinton and Benson were in a relationship.

- 2 -

At the mall, Smith and Staniszewski got in the back seat of the vehicle that Wyrick was driving. Browning followed in another vehicle. Wyrick then picked up Washington, who upon entering the vehicle, pointed a gun at Smith and Staniszewski and stated that they would not get away with stealing the drugs and money. Wyrick drove to the stash house. At this point, Browning observed Wyrick and Washington take Smith and Staniszewski into the house and left the scene.

Smith and Staniszewski were taken down into the basement where Wyrick punched Staniszewski in the mouth, and Washington poured bleach in Staniszewski's mouth. Washington called Benson, stating that they got the people who stole the drugs and told Benson to come to the home. After arriving, Benson asked the victims the location of the drugs. The victims indicated a different person stole the drugs; thereafter, Benson struck one of the victims in the face with the butt of his gun. Washington then invited Bergmann to his home. Bergmann professed his innocence, and upon seeing the victims, indicated the victims were in the situation because of the stolen drugs. Washington gave Bergmann drugs as he left the scene.

Subsequently, Benson retrieved Staniszewski's truck from the mall to search it for the missing money and drugs. After Benson found only small portion of the stolen property in the truck, he indicated to Wyrick that he would kill Smith and Staniszewski. Later, Washington and Benson put the victims into Staniszewski's truck and drove them to a wooded area off Ligonier

Pike in Somerset County. Wyrick followed in a separate vehicle. As soon as Staniszewski's truck stopped, Smith attempted to run away from the scene. Benson shot him in the back. Benson then attempted to shoot Staniszewski, but his gun malfunctioned. Consequently, Washington left the scene to retrieve another weapon. Benson and Wyrick waited at the scene with the two victims. Upon returning, Washington shot both victims in the head two times. Washington, Benson, and Wyrick ran out of the woods. While running, Benson dropped his laser aiming device.

Washington and Benson then drove away in Staniszewski's truck while Wyrick followed them. Washington and Benson eventually pulled over along Somerset Pike, wiped their fingerprints from Staniszewski's truck, abandoned the truck, and left the scene in Wyrick's vehicle. Afterwards, they drove to a different wooded area, disassembled their firearms, and left the components into the woods. Subsequently, Washington, Benson, and Wyrick returned to Johnstown. They went to Browning's residence and argued about Benson dropping the laser aiming device from his firearm as they fled the woods and Washington inviting Bergmann to come into his basement while the victims were there. Washington told Browning that they had beaten up the victims in the basement and then shot them in the woods.

On March 28, 2017, the police found Staniszewski's truck near a bar called "Jim & Jimmies." The remains of Smith and Staniszewski were discovered on September 29, 2017. The police classified the cause of death

for both victims as homicide. During the investigation, the FBI mapped the locations of cell phone numbers associated with Callender, Wyrick, Smith, Staniszewski, Bergmann, and a phone that was designated as a "shared phone." Notably, the victims called the "shared phone" to set up the drug deal that was to take place at the Galleria Mall and the victims' cell phones pinged off cell towers near the stash house on March 27, 2017. The FBI also determined that various calls and texts were made to a phone attributed to Benson and two phones attributed to Washington from some of the phones mapped.

Further, as part of their investigation into the homicides, the Pennsylvania State Police obtained a search warrant for Washington's apartment in Cambria County. The affidavit of probable cause in support of the warrant stated that the search was related to the homicide investigation. Upon executing the warrant, the officers discovered controlled substances, drug paraphernalia, and firearms. As a result, police arrested Washington, and the Commonwealth charged him with various offenses. On October 1, 2018, Washington pled guilty to possession with intent to distribute a controlled substance in the Cambria County Court of Common Pleas and that court sentenced him to 30 to 84 months in prison.

In December 2018, the police arrested Washington and Wyrick for the murders of the victims.[5] The Commonwealth charged Washington in Somerset County with two counts each of homicide, aggravated assault, kidnapping, and conspiracy. Subsequently, Washington and Wyrick's cases were joined for trial. Later, Benson, Callender, and Hinton were joined as codefendants with Washington and Wyrick. Washington filed a motion to sever the cases. The trial court denied the motion to sever.

Washington also filed a motion to dismiss based upon double jeopardy, arguing that the Cambria County and Somerset County cases involve one criminal episode and that the charges should have been tried together. Specifically, Washington argued that the drugs found in Cambria County were obtained as part of the Somerset County homicide investigation. Washington averred that the homicide charges should have been prosecuted with the drug charges in Cambria County under the compulsory joinder rule.[6] The trial court found that the first and third prongs were met—the Cambria County drug possession case resulted in a conviction and, at the time of the entry of the

_____

[5] The police later arrested Benson, Callender, and Hinton.

[6] Under the compulsory joinder rule, a current prosecution is prohibited if a defendant meets all four prongs under 18 Pa.C.S. § 110(1)(ii): (1) "[t]he former prosecution must have resulted in an acquittal or conviction[;]" (2) the subsequent prosecution is "based on the same conduct or arising from the same criminal episode[;]" (3) the "offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial[;]" and (4) the offense "occurred within the same judicial district as the former prosecution." 18 Pa.C.S. § 110(1)(ii).

guilty plea in Cambria County, the prosecution was aware that the police were investigating Washington's role in the murder of the victims, as evidenced by the search warrant of his apartment. The trial court found that the fourth prong was met regarding the kidnapping, assault, and conspiracy charges because they occurred in either Cambria County or Somerset County, but not the homicide charge, due to the location of the bodies in Somerset County. Additionally, the trial court found the second prong was not met as the drug possession in Cambria County was a different criminal episode than the kidnapping, assault, and murder episode.

Ultimately, on July 14, 2022, the trial court denied Washington's motion to dismiss, finding it to be frivolous. Because of the finding of frivolity, Washington filed a petition for permission to appeal to this Court pursuant to Pa.R.A.P. 1311(a)(3) prior to the commencement of trial. Washington also requested the trial court stay the proceedings pending the outcome of the petition with this Court. The trial court denied the stay and subsequently, this Court did the same. Ultimately, this Court entered a per curiam order denying the petition for permission to appeal. **See** Order, 44 WDM 2022 (Pa. Super. filed Sept. 21, 2022). Washington filed a petition for permission to appeal to the Pennsylvania Supreme Court. The Supreme Court denied Washington's petition for allowance of appeal on March 8, 2023, after his trial had been completed. **See Commonwealth v. Washington**, 293 A.3d 1219 (Pa. 2023) (per curiam).

In the interim, Washington filed a motion in limine seeking to preclude the Commonwealth from admitting evidence that he was a drug dealer in the Johnstown community. The Commonwealth also filed a motion in limine, requesting that the defense be precluded from introducing statements made by Landon Reighard ("Reighard"), who was deceased. The trial court denied Washington's motion in limine, and granted the Commonwealth's motion to exclude Reighard's statements, aside from three specific statements made by Reighard that were against his interest: (1) he was involved with victims in the robbery of Washington, Benson, and Wyrick, (2) he used illicit drugs, and (3) he was helping the victims sell drugs.

Originally, the trial court scheduled trial for October 12, 2022, but prior to trial, Wyrick pled guilty to two counts of third-degree murder and agreed to testify on the Commonwealth's behalf.[7] The jury trial held for the charges against Washington, Benson, and Callender occurred between October 17 and October 21, 2022. At the conclusion of trial, the jury found both Benson and Washington guilty of all charges and acquitted Callender. Subsequently, the trial court also found Washington guilty of possession of a firearm by a prohibited person.

---

[7] Hinton's case was also severed from this case after the trial court dismissed conspiracy charges against her.

On January 4, 2023, the trial court sentenced Washington to an aggregate term of life in prison without the possibility of parole. At sentencing, Washington made a motion for extraordinary relief and a request for arrest of judgment based on double jeopardy. The trial court denied the motions. The trial court also ordered restitution to the victims' families for funeral expenses to be paid jointly and severally by the codefendants. Specifically, the trial court ordered codefendants to pay $1,644.96 to Staniszewski's family and $2,800 to Smith's family. The Commonwealth filed a timely post-sentencing motion, seeking to amend the restitution for Smith's funeral to $2,770 and payment be made to the funeral home.[8] On January 18, 2023, the trial court granted the Commonwealth's motion. Washington timely appealed.[9]

Washington raises the following questions for our review:

1. Whether the verdict was against the weight of the evidence?

2. Whether the verdict was against the sufficiency of the evidence?

---

[8] Washington did not file any post-sentence motions.

[9] While Washington filed his notice of appeal the day before the trial court granted the Commonwealth's motion, we overlook this jurisdictional defect by treating as done what ought to have been done, and treat this appeal as timely filed because Washington indisputably had notice of the final sentence decreasing his share of the restitution. *See Commonwealth v. Carter*, 122 A.3d 388, 391 (Pa. Super. 2015). We have changed the caption to reflect the correct sentencing date.

3.    Whether the Court of Common Pleas of Somerset County had jurisdiction to hear this matter due to double jeopardy/compulsory joinder arguments?

4.    Whether [the] trial court erred by denying co[]defendants Washington's, Wyrick's and Benson's requests for severance?

5.    Whether [the] trial court erred by denying [Washington's] request to stay proceedings pending appeal to Superior Court and Supreme Court regarding double jeopardy/compulsory joinder matters?

6.    Whether the trial court erred by denying the defense the ability to elicit testimony regarding Landon Reighard during trial?

7.    Whether the trial court erred by permitting [the] Commonwealth to utilize [the] updated FBI Cellular Data Analysis report without the defense having been provided the same prior to trial?

8.    Whether the trial court erred by permitting the Commonwealth to reference a phone number contained within the updated FB[I] Cellular Data Analysis report as being associated with Samson Washington without having laid a proper foundation?

9.    Whether the trial court erred by permitting the Commonwealth to utilize [the] updated FBI Cellular Data Analysis report that contained references to a "shared drug phone" without laying proper foundation?

10.    Whether the trial court erred by allowing the Commonwealth to utilize the updated FBI Cellular Data Analysis report with specific reference to a phone number associated with Samson Washington without laying a proper foundation?

11.    Whether the trial court erred by denying [Washington's] [m]otion in [l]imine requesting that the Commonwealth be prohibited from introducing evidence that [Washington] was a drug dealer in his community?

Washington's Brief at 6-8 (bracketed corrections added).[10]

## 1. **Weight of the Evidence**

In his first claim, Washington argues that his convictions were against the weight of the evidence presented at trial. *Id.* at 18, 21. Washington asserts that there was no DNA evidence linking him to the murders, and the entire case relied on lay testimony. *Id.* at 20. Washington claims that the trial court gave too much weight to Wyrick's contradictory testimony and the imprecise cellular phone data. *Id.*

The following legal principles apply to a trial court's consideration of a challenge to the weight of the evidence supporting a conviction:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> Thus, to allow an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks the conscience of the trial court.

_____

[10] We note that issues 8 and 10 raise the same claims of error.

*Commonwealth v. Juray*, 275 A.3d 1037, 1046-47 (Pa. Super. 2022) (quotation marks and citations omitted).

The trial court ruled on Washington's weight claim, finding that

[i]n addition to the evidence presented, … there are two reasons why [Washington's] convictions were not against the weight of the evidence. First, the Commonwealth's witnesses' version of events were generally consistent with each other. Additionally, the forensic evidence and cellular date evidence corroborated the testimony of the Commonwealth witnesses. Second, the defense did not present any defense witnesses that raised serious questions about the Commonwealth's case in chief.

Trial Court Opinion, 7/13/23, at 48.

Washington's argument invites this Court to reassess the credibility of the witnesses and reweigh the evidence in favor of Washington to reach a different result. We decline Washington's invitation, as the factfinder, the jury in this case, is the ultimate arbiter of the credibility of the witness and the weight to be given to the evidence. *See Commonwealth v. Clemons*, 200 A.3d 441, 464 (Pa. 2019) (noting that the jury is the factfinder and sole arbiter of the witnesses' credibility). The credible evidence established that the Commonwealth witnesses, including Wyrick, were generally consistent, and the forensic evidence and cellular data evidence corroborated the witness' testimony. *See* Trial Court Opinion, 7/13/2023, at 48; *see also Commonwealth v. Landis*, 277 A.3d 1172, 1183 (Pa. Super. 2022) ("A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different

conclusion.") (citation omitted). Therefore, the verdicts were not so contrary to the weight of the evidence as to shock one's sense of justice.

## 2. Sufficiency of the Evidence

In his second claim, Washington contends that the evidence was insufficient to support his convictions. Washington's Brief at 15, 17. Washington argues that the Commonwealth did not present any witnesses who could place him at the scene of the homicide, assault, or kidnapping beyond Wyrick, Browning, and Jamar Jordan ("Jordan").[11] *Id.* at 16. According to Washington, Wyrick testified only after he was offered a plea bargain, and his testimony was inconsistent with the Commonwealth's other witnesses. *Id.* at 16-17. Washington takes issue with the trial court's finding that the testimony of Wyrick, Browning, and Jordan was corroborated by forensic evidence and cellular data, noting that no evidence established the "shared phone" on the scene of the kidnapping and assault belonged to Washington. *Id.* at 17. Washington further notes that only his codefendants' phones and the "shared phone" were at the scene of the shootings. *Id.* Therefore, Washington concludes that no scientific evidence established his presence at the murder scene. *Id.*

_____

[11] Jordan sold drugs with Washington from the stash house. N.T., 10/18/2022, at 290-91. Jordan indicated that Washington told him that the victims had broken into his home and took drugs and money and that the victims "paid a price for it." *Id.* at 299.

We review a challenge to the sufficiency of the evidence according to the following standard:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the [factfinder] to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the [factfinder].

*Commonwealth v. Rosario*, 307 A.3d 759, 764–65 (Pa. Super. 2023) (citation omitted).

Preliminarily, we observe that Washington's arguments that the evidence was insufficient actually challenges the weight of the evidence, as his claims focus on the unreliability of Wyrick's testimony because it was not corroborated by physical evidence. *See Commonwealth v. Thomas*, 194 A.3d 159, 167 (Pa. Super. 2018) ("It is well-settled that credibility determinations go to the weight, not the sufficiency of the evidence.") (citation and quotation marks omitted). This Court has explained that a sufficiency challenge does not include an assessment of witness credibility. *Juray*, 275 A.3d at 1043. As noted above, Washington's weight of the evidence challenge is without merit.

Further, our review of the record reveals the evidence was sufficient to support his convictions. In his appellate brief, Washington does not contest the evidence in relation to any specific element of his convictions. Instead, his argument is premised solely upon the Commonwealth's alleged failure to prove that he was the person who committed the crimes. The evidence presented at trial, viewed in a light most favorable to the Commonwealth, was sufficient to establish that Washington committed the crimes. *See* Trial Court Opinion, 7/13/2023, at 28-47. Notably, Wyrick stated that he and Washington transported the victims from the mall to the residence on Boyd Avenue at gunpoint. N.T., 10/19/2022, at 681-685. The victims were tied up and Wyrick punched Staniszewski in the mouth and Washington poured bleach down Staniszewski's throat. *Id.* at 540-41, 689. Wyrick testified that Washington shot both victims twice in the head. *Id.* at 699-705. Browning testified that Washington admitted that he, Benson, and Wyrick took the victims into the woods and killed them. N.T., 10/20/2022, at 870. Therefore, the evidence was sufficient to support Washington's convictions. ***See Commonwealth v. Johnson***, 838 A.2d 663, 669-70 (Pa. 2003) (concluding evidence was sufficient to support finding that defendant was the killer, as an eyewitness testified he saw defendant shoot victim, and a second witness, who did not see actual killing, corroborated details of eyewitness witness's account).

### 3. Compulsory Joinder

In his third claim, Washington argues that the compulsory joinder rule barred the Commonwealth from prosecuting his kidnapping and homicide charges in Somerset County because he had already pled guilty to the drug charge in Cambria County and all the charges were part of the same criminal episode. Washington's Brief at 21-31. Washington contends that the search warrant obtained for his apartment in Cambria County was part of the Somerset County homicide investigation. *Id.* at 23. According to Washington, the items to be found during the search were anticipated to be related to the homicide investigation and the prosecuting authorities in Cambria and Somerset Counties were aware of the search. *Id.* at 23-24, 26. Washington highlights that the items confiscated during the search were used in the prosecutions in both counties. *Id.* at 24.

Citing to 18 Pa.C.S. § 110, Washington argues that contrary to the trial court's finding, he met all four prongs. *Id.* at 25-31; *see also* note 6, *supra*. Washington observes that the trial court found he met the first and third prongs, as he pled guilty to the delivery charge in Cambria County, and he could have been charged in Cambria County with all the offenses brought in Somerset County. Washington's Brief at 26, 28-29.

Regarding the second prong, Washington contends that the trial court erred in analyzing the logical and temporal relationships between the acts in each case and finding the drug and homicide cases required different evidence. *Id.* at 26-27. According to Washington, the police were looking for

evidence at his residence related to the homicide investigation, and had the Commonwealth been required to bring the Cambria County case to trial, they would have presented duplicative evidence from the residence in that case and Somerset County. *Id.* at 27-28.

Finally, Washington notes that the trial court found the fourth prong was met for the kidnapping, assault, and conspiracy charges, as they occurred in Cambria County, but not the homicide charge, as the murder may have occurred in Somerset County. *Id.* at 29-30. Washington maintains that most of the conspiracy involving the charges occurred in Cambria County, and argues that conspiracy may be brought in any county where a conspiracy was formed. *Id.*

Washington also claims that the trial court erred in finding his compulsory joinder argument to be frivolous, noting that the trial court conceded he met three of the four prongs. *Id.* at 30-31. Washington concludes that even if the homicide charge was properly brought in Somerset County, the remaining charges should have been brought in Cambria County in his initial drug delivery prosecution. *Id.* at 31.

"Where the relevant facts are undisputed, the question of whether prosecution is barred by the compulsory joinder rule, 18 Pa.C.S.A. § 110, is subject to plenary and de novo review." *Commonwealth v. Brown*, 212 A.3d 1076, 1082 (Pa. Super. 2019).

"Section 110 of the Crimes Code generally prohibits subsequent prosecution of a defendant for different crimes arising from the same criminal episode after the defendant has already been convicted or acquitted of criminal charges arising from that criminal episode." ***Commonwealth v. Copes***, 295 A.3d 1277, 1279 (Pa. Super. 2023) (citing 18 Pa.C.S. § 110). "Section 110's compulsory joinder rule was designed to serve two distinct policy considerations: (1) to protect a person accused of crimes from governmental harassment by being forced to undergo successive trials for offenses stemming from the same criminal episode, and (2) to ensure judicial economy." ***Commonwealth v. Forrester-Westad***, 282 A.3d 811, 821 (Pa. Super. 2022) (citation and brackets omitted).

As recited hereinabove, there is a four-part test to determine when section 110 bars a subsequent prosecution:

(1) the former prosecution must have resulted in an acquittal or conviction;

(2) the current prosecution is based upon the same criminal conduct or arose from the same criminal episode as the former prosecution;

(3) the prosecutor was aware of the instant charges before the commencement of the trial on the former charges; and

(4) the current offense occurred within the same judicial district as the former prosecution.

***Copes***, 295 A.3d at 1279 (citation omitted). "Each prong of this test must be met for compulsory joinder to apply." ***Commonwealth v. Davis***, 242 A.3d 923, 935 (Pa. Super. 2020) (citation omitted).

Here, the thrust of Washington's argument concerns the second prong—whether the drug delivery conviction in Cambria County was based on the same criminal conduct and episode as the charges arising out of the murder of the two victims.

> To determine whether various acts constitute a single criminal episode, a court must consider the logical relationship and the temporal relationship between the acts. Courts have recognized that although the relationship between the timing of actions is often determinative, in defining what acts constitute a single criminal episode, not only is the temporal sequence of events important, but also the logical relationship between the acts must be considered. Offenses are logically related when there is a substantial duplication of factual, and/or legal issues presented by the offenses. Whether there is substantial duplication of fact and law depends ultimately on how and what the Commonwealth must prove in the subsequent prosecution. For example, there would be substantial duplication if the Commonwealth's case rests solely upon the credibility of one witness in both prosecutions and there would not be substantial duplication if proof requires the introduction of the testimony of completely different police officers and expert witnesses as well as the establishment of separate chains of custody.

*Copes*, 295 A.3d at 1280 (citations, quotation marks, and paragraph break omitted).

Here, in denying Washington's motion, the trial court found that evidence required to establish the crime of possession with intent to deliver was substantially different from the evidence establishing the kidnapping, assault, conspiracy, and homicide charges. Trial Court Opinion, 7/14/2022, at 6. More specifically, the trial court observed that for the possession with intent to deliver charge, the Commonwealth would have presented evidence related to the drugs and contraband seized from Washington's residence,

while the charges related to the murder of the two victims required the Commonwealth to present eyewitness testimony, cell phone data, forensic evidence, and the autopsies. *Id.* The trial court concluded that there was not a substantial duplication of facts and law between the cases. *Id.* at 7.

We conclude that the trial court did not commit legal error in ruling upon Washington's compulsory joinder argument. There is clearly not a substantial temporal or logical connection between the crimes. Beginning with the temporal connection, the record reflects that the crimes related to the killing of the two victims occurred on March 27, 2017, when Washington and his co-conspirators kidnapped, assaulted, and murdered the victims. The crimes related to possession with intent to deliver occurred on December 19, 2017, when the police executed a search warrant on Washington's residence and discovered controlled substances and contraband. Therefore, there was scant temporal relationship between the crimes. *See Copes*, 295 A.3d at 1280.

Likewise, there is no logical connection between the crimes. Possession with intent to deliver and the crimes arising out of the murder require the introduction of different lay witnesses, expert witnesses, and forensic and other scientific evidence. *See id.* at 1281 (finding no logical connection between prosecution as "there is little, if any, duplication in the witnesses or evidence necessary to support the respective convictions.").

Moreover, there is not a commonality of legal issues within the two prosecutions. The fact that the drugs were found during a search of

Washington's residence that was conducted as part of the homicide investigation does not in and of itself provide a logical connection between the prosecutions. *See Commonwealth v. Reed*, 990 A.2d 1158, 1164-65 (Pa. 2010) (finding that the fact police located items of evidence used in a murder and kidnapping prosecution in one county at the same time they obtained evidence of a firearm unrelated to the murder and drug offenses supporting another county's prosecution was not a sufficient and logical connection to support finding the offenses constituted one criminal episode). The two sets of prosecutions also clearly would require proof of different legal elements. *See Brown*, 212 A.3d at 1083 (noting that "the alleged crimes did not have any overlapping elements, and that any duplication of factual issues or evidence was 'de minimis and insufficient to establish a logical relationship' between the charges") (citation omitted). Further, Washington has not established through any evidence or argument that the drugs found in his residence were the same drugs that were stolen from Washington's gang. Therefore, he has not established a logical connection between the prosecutions.

We therefore conclude, based upon the totality of the circumstances, that the cases brought against Washington in Cambria and Somerset Counties constituted two separate criminal episodes that are distinct and apart from each other. As the four-part test has not been satisfied, *see Davis*, 242 A.3d at 935, we find that 18 Pa.C.S. § 110(1)(ii) did not bar the current charges

brought against Washington for his involvement in the murder of the victims.[12] Washington's third argument fails.

### 4. Severance

In his fourth claim, Washington contends that the trial court erred in denying his motion to sever his trial from his codefendants, Benson and Wyrik. Washington's Brief at 32, 40. Washington argues that the admission at trial of inculpatory statements made by Washington to Jordan and Browning violated **Bruton v. United States**, 391 U.S. 123, 135-37 (1968) (concluding that a confession from non-testifying codefendant that directly incriminates the defendant in a joint trial is of such a powerfully incriminating nature that an instruction to the jury limiting its consideration of the confession is insufficient to cure prejudice to the defendant from the confession's admission at trial). Washington's Brief at 32-39. Washington disputes the trial court's finding that the statements by Jordan and Browning were not testimonial in nature and did not implicate **Bruton**. **Id.** at 39. Washington claims that the United States Supreme Court has not limited the Confrontation Clause protections to only testimonial hearsay. **Id.** (citing **Crawford v. Washington**, 541 U.S. 36, 68 (2004)).

---

[12] Washington also baldly asserts the trial court erred in finding his claim frivolous. However, even if the trial court erred, we conclude that Washington is not entitled to relief because his double jeopardy claim is without merit.

"Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." ***Commonwealth v. Knoble***, 188 A.3d 1199, 1205 (Pa. Super. 2018) (citation omitted).

"Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Pa.R.Crim.P. 582(A)(2). "The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583. However, "[u]nder Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." ***Commonwealth v. Dozzo***, 991 A.2d 898, 902 (Pa. Super. 2010) (citation omitted).

Here, Washington's reliance on ***Bruton*** is misplaced, as the testimony by Browning and Jordan at trial referenced Washington's own statements, not those of his codefendants. ***See Commonwealth v. McCrae***, 832 A.2d 1026, 1038 (Pa. 2003) (stating that ***Bruton*** applies only where there is "introduction of a powerfully incriminating statement made by a non-testifying co[]defendant at a joint trial," and "***Bruton*** is inapplicable to statements made by an individual other than a non-testifying co[]defendant at a joint trial of

co[]defendants"). Washington has not established through any argument or analysis that the *Bruton* holding extends to confessions made by the defendant himself. Further, Washington has not cited to any statements made by a non-testifying codefendant that implicated him or was prejudicial to him.

Moreover, Washington does not dispute that the consolidation of his case with his codefendants promoted judicial economy and enhanced fairness among the codefendants. As our Supreme Court has observed, if the crimes charged against each defendant arise out of the same facts and evidence,

> [i]t would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience … of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand.

*Commonwealth v. Rainey*, 928 A.2d 215, 231 (Pa. 2007) (citation omitted).

At trial, the prosecution presented numerous witnesses, and forensic and cell phone data evidence. Consolidating the three cases eliminated the inconvenience and burden for the prosecution to require these witnesses to give testimony at multiple trials. *See id.* Accordingly, Washington failed to show that the trial court abused its discretion in consolidating his trial with his codefendants' prosecutions. Therefore, Washington's fourth issue fails.

### 5. **Request for Stay**

In his fifth claim, Washington contends that the trial court erred in denying his request to stay proceedings pending his appeal to this Court and

the Pennsylvania Supreme Court regarding his double jeopardy and compulsory joinder claims. Washington's Brief at 40-43. Washington argues that the Supreme Court denied allowance of appeal without comment and notes that it may have heard his case had he not already been convicted. *Id.* at 42-43. Washington asserts that he was prejudiced by the trial court's refusal to stay the proceedings pending the resolution of his interlocutory appeal. *Id.* at 43.

Preliminarily, we note that Washington has not indicated the relief he seeks. Washington merely asks for this Court to rule upon his underlying claim regarding compulsory joinder and double jeopardy, which we have, finding the argument to be meritless. Accordingly, no relief is due on this issue.

### 6. **Admissibility of Evidence: Reighard's Recorded Statement**

In his sixth claim, Washington contends that trial court abused its discretion in denying him the ability to elicit testimony regarding Reighard at trial. Washington's Brief at 43. Noting that the trial court allowed the introduction of some statements by Reighard, Washington argues that he attempted to introduce an additional statement given by Reighard to another Commonwealth witness, Mindy Olshavsky ("Olshavsky"),[13] three days after the murders regarding the location of the bodies of the victims, which was a

---

[13] Olshavsky is Bergmann's stepsister and knew both victims and Reighard. N.T., 10/18/2022, at 370-72.

statement against his interest. *Id.* at 44-45. Washington asserts that the trial court erred in ruling this statement was inadmissible hearsay, finding that Reighard was simply stating a fact and not making a statement against his interest. *Id.* at 45. Washington's statement to Olshavsky was that he was a person of interest in the murders, and he knew the location of the bodies, thus establishing the statement was incriminating. *Id.* at 47.

Additionally, Washington sought to introduce Reighard's statement to Olshavsky, "I am just really, really fuckin' done with everyone. I am to the point right now where I am really better off dead." *Id.* at 48 (citation omitted). Washington argues that this statement was admissible under the hearsay exceptions of excited utterance and an existing emotional state of mind, claiming that Reighard felt remorse or stress. *Id.* at 48-49. Washington maintains that these statements should have been admitted to provide the jury with evidence of another suspect of the murders. *Id.* at 49.

"The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. Ganjeh***, 300 A.3d 1082, 1091 (Pa. Super. 2023) (citation and brackets omitted).

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is inadmissible "except as provided by [the Rules of Evidence], by

other rules prescribed by the Pennsylvania Supreme Court, or by statute."

Pa.R.E. 802; *see also Commonwealth v. Rivera*, 238 A.3d 482, 492 (Pa.

2020) ("Hearsay generally is inadmissible unless it falls within one of the

exceptions to the hearsay rule delineated in the Pennsylvania Rules of

Evidence.").

We will first address Reighard's out-of-court statement regarding the

location of the bodies of the victims. Washington believes this statement is

admissible under the statement against interest hearsay exception. A

statement may be admitted under the hearsay exception for statements

against interest if the declarant is unavailable as a witness and

>    (A)    a reasonable person in the declarant's position would have
>           made only if the person believed it to be true because, when
>           made, it was so contrary to the declarant's proprietary or
>           pecuniary interest or had so great a tendency to invalidate
>           the declarant's claim against someone else or to expose the
>           declarant to civil or criminal liability; and
>
>    (B)    is supported by corroborating circumstances that clearly
>           indicate its trustworthiness, if it is offered in a criminal case
>           as one that tends to expose the declarant to criminal
>           liability.

Pa.R.E. 804(b)(3).

The trial court rejected Washington's claim:

Here, Reighard's statement indicates that he had knowledge three
days after the murders of the general area of where the victims'
bodies were. The fact that Reighard knew of the general area of
where the victims' bodies would be found is not indicative of
criminal liability. Perhaps, if he were alive, this statement would
make him a witness to the case, but the statement alone would
not subject him to criminal liability. In other words, having some

knowledge of certain details of a crime committed days earlier does not per se subject someone to criminal liability.

Trial Court Opinion, 7/13/2023, at 18 (footnote omitted); *see also* N.T., 10/18/2022, at 404 (denying admission of the statement at trial because "[j]ust simply knowing facts about something is not a statement against interest").

We conclude that the trial court did not abuse its discretion in denying admission of this out-of-court statement by Reighard. Significantly, a statement is admissible as a statement against interest if it exposes the declarant to criminal liability. *See* Pa.R.E. 804(b)(3)(B); *cf. Commonwealth v. Statum*, 769 A.2d 476, 480 (Pa. Super. 2001) (noting that an unavailable witness' statement was admissible under the statement against interest hearsay exception because the witness admitted to the crime for which the defendant had been charged). Identifying the location of the bodies did not, in and of itself, implicate Reighard in any crime. The trial court therefore did not abuse its discretion in denying admission of this evidence.

We next turn to Washington's attempt to introduce Reighard's statement on March 28, 2017, "But yes, I am just really, really fuckin' done with everyone. I am to the point right now where I am really better off dead," N.T., 10/18/2022, at 410, under the excited utterance and then-existing mental, emotional, or physical condition hearsay exceptions. These exceptions state the following:

**(2) Excited Utterance.**  A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.  When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition….

**(3) Then-Existing Mental, Emotional, or Physical Condition.**  A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(2), (3).

Here, Washington does not demonstrate the statement was made in relation to a startling event or condition to meet the excited utterance exception.  Nor does he provide any context of the statement to establish Reighard's then-existing state of mind related to the murders.

Further, and more globally, Washington has not established the relevance of this out-of-court statement.  *See* Pa.R.E. 402 ("Evidence that is not relevant is not admissible.").  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Pa.R.E. 401.  Both before the trial court and in his brief before this Court, Washington failed to explain the context surrounding the statement or how, if at all, it was related to this case.  *See* Trial Court Opinion, 7/13/2023, at 20.  He purely speculates as to what Reighard was feeling, that the statement was somehow a statement of remorse, and what, if anything, Reighard was

remorseful about without any evidentiary support or analysis. ***See, e.g., Commonwealth v. Fitzpatrick***, 255 A.3d 452, 479 (Pa. 2021) (noting that the introduction of a statement under the then-existing mind hearsay exception "must be pertinent to some contested issue in the legal proceeding"). The trial court properly excluded this evidence at trial. Washington's claim is without merit.

### 7. <u>Admissibility of Evidence: Updated FBI Cellular Data Analysis</u>

In his seventh issue on appeal, Washington intended to argue that the trial court erred in permitting the Commonwealth to utilize an updated FBI cellular data analysis. Washington's Brief at 49. Washington expressly withdraws this issue from consideration on appeal. ***Id.***

### 8. <u>Authentication of Cell Phone Evidence</u>

In his eighth issue, Washington contends that the trial court erred by permitting the Commonwealth to introduce an FBI cellular analysis report, wherein Agent John Orlando ("Agent Orlando") compiled an analysis based on cell phone tracking of six phones and determined that two unrelated phone numbers, one ending in 7381 and another ending in 9204, showing incoming and outgoing calls to the six phones, were associated with Washington without setting forth a proper foundation for the information.[14] ***Id.*** at 49-50, 53. Washington acknowledges that the numbers in question were found in

_____

[14] The full phone numbers were included in the records and testimony at trial.

Wyrick's phone under the contact name "Blamson," which was Washington's nickname. *Id.* at 50, 52. And although Washington concedes that one phone number (ending in 9204) was found to belong to him through records from a cellphone company, the other number (ending in 7381) was solely connected to him based upon his nickname in Wyrick's phone, which he contends is insufficient. *Id.* at 52. According to Washington, the fact that the numbers were saved in Wyrick's phone as a nickname associated with Washington did not establish a proper foundation for the admission of this evidence at trial because the number could have been entered in this manner for many different reasons. *Id.* at 53. Washington argues that no other evidence (such as subscriber information) corroborated the information that the phone number belonged to Washington. *Id.*

[T]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "Authentication generally entails a relatively low burden of proof[.]" *Commonwealth v. Murray*, 174 A.3d 1147, 1157 (Pa. Super. 2017) (citation omitted). Circumstantial evidence may be used to authenticate evidence. *Commonwealth v. Orr*, 255 A.3d 589, 595-96 (Pa. Super. 2021).

At trial, Agent Orlando testified that in preparing the report, he reviewed the Commonwealth's case file, including the cell phone extraction report from Wyrick's phone completed by Special Agent April Campbell that contained a

list of contacts of names and cell phone numbers, a list of the defendants' names and nicknames, including Washington's nickname of "Blamson," and cell phone records and certifications. *See* N.T., 10/20/2022, at 925-27; N.T., 10/19/2022, at 589-93 (Commonwealth Exs. at 92-96A — cell phone records and certifications for various numbers); N.T., 10/19/2022, at 635 (Commonwealth Ex. 100 — cell phone extraction report); N.T., 10/19/2022, at 652 (Commonwealth Ex. 101 — pictures, names, and nicknames of the defendants); *see also* N.T, 10/19/2022, at 593-94 (Special Agent Matthew Seefeld of the Pennsylvania Office of the Attorney General testified that the subscriber of the phone number ending in 9204 was Washington); *id.* at 635-36 (Special Agent Campbell testified that two phone numbers, ending in 9204 and 7381, were associated with "Blamson" in Wyrick's phone). Agent Orlando stated that he analyzed six numbers, including a "shared phone," Callender's phone, the victims' phones, Wyrick's phone, and Bergmann's phone. N.T., 10/20/2022, at 936-37; *see also id.* at 935 (Commonwealth Ex. 102 — FBI Cellular Analysis Report). Agent Orlando indicated that Washington and Benson were listed in Wyrick's phone under their nicknames. N.T., 10/20/2022, at 938; N.T., 10/19/2022, at 593-94, 635-36.

Our review of the record reveals that although the Commonwealth properly authenticated the 9204 number as belonging to Washington, it did not properly authenticate the 7381 number as his, because there was no evidence to support that this number belonged to Washington, aside from the

saved contact in Wyrick's phone. *See Commonwealth v. Koch*, 39 A.3d 996, 1005 (Pa. Super. 2011) (noting that because a cell phone may not necessarily be used exclusively by the person whom the phone number is assigned, "circumstantial evidence, which tends to corroborate the identity of the sender, is required.").[15]  We nevertheless conclude that this error was harmless.

> The harmless error doctrine provides as follows:
>
> Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or 2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Callen*, 198 A.3d 1149, 1163 (Pa. Super. 2018) (citation omitted); *see also Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) (stating that "sua sponte invocation of the harmless error doctrine is not inappropriate as it does nothing more than affirm a valid judgment of sentence on an alternative basis").

---

[15] An evenly divided Supreme Court affirmed our decision in *Koch*. *Commonwealth v. Koch*, 106 A.3d 705 (Pa. 2014).  "Due to the lack of a majority opinion, the Supreme Court's decision in *Koch* is not binding upon us." *Orr*, 255 A.3d at 596.  Notably, numerous post-*Koch* cases have "applied our own opinion in *Koch* as binding on the subject of authentication." *Id.* (collecting cases).

Here, the prejudicial impact of erroneously attributing the number ending in 7381 to Washington was de minimis. As stated above, Washington does not dispute that the number ending in 9204 belonged to him or that he exchanged numerous phone calls with Wyrick, Benson, and Bergmann during the period in question, and that this was also stated in the report. *See, e.g.,* N.T., 10/20/2022, at 944-45 (Agent Orlando testifies that the cell data analysis confirmed testimony that Wyrick called Washington on the morning of the burglary of the drug stash house), 947 (cell data confirms Bergmann spoke with Washington on March 27, 2017).

Moreover, the FBI cellular analysis report did not explicitly provide any information regarding the identity of the shooter in this case, only that the shared phone, Wyrick, and the two victims were in the vicinity of the murder scene, the shared phoned was traveling toward Johnstown at the time Washington left the scene to get a new gun, and Wyrick was messaging the shared phone during this time. *See* N.T., 10/20/2022, at 967, 969-71. Accordingly, Washington is not entitled to relief. *See Commonwealth v. Wilson*, 286 A.3d 1288, 1300 (Pa. Super. 2022) (noting that the "harmless error doctrine reflects the reality that the accused is entitled to a fair trial, not a perfect trial") (citation and quotation marks omitted).

## 9. Admissibility of Evidence: Shared Phone

In his ninth claim, Washington argues that the trial court erred in permitting the Commonwealth to introduce evidence of a "shared phone" in

the FBI report. Washington's Brief at 53. However, Washington affirms that he did not preserve this issue for appeal and withdraws the issue for consideration on appeal. *Id.*; *see also* Trial Court Opinion, 7/13/2023, at 27-28 (noting that Washington did not object to the issue of the "shared phone" before the trial court).

**10.      Admissibility of Evidence: Drug Dealer in the Community**

In his final claim, Washington contends that the trial court erred in denying his motion in limine seeking to exclude evidence that he was a drug dealer in his community. Washington's Brief at 54. Washington argues that the prejudicial impact of the admission of this evidence outweighed the probative value. *Id.* at 54, 58. Washington notes that the evidence of prior bad acts or unrelated criminal activity is generally inadmissible to show a defendant acted in conformity with those prior acts or to show a defendant's criminal propensity. *Id.* at 55. Washington asserts that the entire trial centered on the fact he was a drug dealer, his drugs had been stolen, and he and his codefendants were part of a gang from Ohio that was involved in drug activity. *Id.* at 57-58. Washington claims that the repetitive nature of the drug related evidence was extremely prejudicial "because it was cumulative and irrelevant to showing motive." *Id.* at 58.

"When ruling on a trial court's decision to grant or deny a motion in limine, we apply an evidentiary abuse of discretion standard of review." *Commonwealth v. Cook*, 231 A.3d 913, 919 (Pa. Super. 2020). "[A]n abuse

of discretion occurs only where the trial court has reached a conclusion that overrides or misapplies the law, or when the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias or ill-will." *Id.* (citation omitted).

"Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity." *Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009) (citing Pa.R.E. 404(b)(1)). "However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Sherwood*, 982 A.2d at 497 (citing Pa.R.E. 404(b)(2)). "[E]vidence may also be admitted where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development." *Commonwealth v. Powell*, 956 A.2d 406, 419 (Pa. 2008). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." *Sherwood*, 982 A.2d at 497.

The trial court, in denying Washington's motion in limine, stated the following:

> [The trial court] would allow testimony and evidence to generally show that the defendants were involved in drug-dealing in the Johnstown community at or about the time that these alleged events occurred. It is the natural course of events in the history of the case. It clearly shows the Commonwealth's allegations of motive and why they would have wanted to kidnap the victims. …

- 36 -

> [I]t all ties into the story line of this case, and … it is appropriate for the jury to understand the case to hear that evidence.

N.T., 7/27/2022, at 106.

We conclude that the trial court's conclusion is supported by the record and the law.  Washington's drug related activity was relevant and probative of the motive and intent as to why Washington and his codefendants kidnapped, assaulted, and ultimately murdered the victims.  ***See Ganjeh***, 300 A.3d at 1091 (stating that "[t]he challenged evidence shows the chain or sequence of events which formed the history of the case, is part of the natural development of the case, and demonstrates [a]ppellant's malice and ill-will toward the victim").  Therefore, the trial court did not abuse its discretion in denying Washington's motion in limine.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 5/2/2024